# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| MARION T, LLC, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Cause No. 1:12-CV-456 |
| | ) |
| THERMOFORMING MACHINERY | ) |
| & EQUIPMENT, INC., | ) |
| | ) |
|     Defendant. | ) |

## OPINION AND ORDER

### I. INTRODUCTION

This case concerns the ownership of some manufacturing equipment that Marion T, LLC, and Thermoforming Machinery & Equipment, Inc. ("TME"), thought they had amicably divided in a written agreement. The issue in the recent one-day bench trial, however, was whether they mistakenly signed what TME contends was only a rough draft, which reallocated to Marion T some valuable equipment TME wanted, or whether, as Marion T argues, the parties agreed to that allocation.[1] A little background helps to frame the dispute.

At one time, Marion T owned a factory building and leased part of it to TriEnda for the making of plastic pallets. When TriEnda's venture failed, Lexington Logistics purchased TriEnda's equipment and assets, and then sold them to TME, a broker in the business of buying and selling such items. In the meantime, Marion T was getting no rent for its vacant building that was storing TriEnda's former equipment, now owned by TME. Eventually, to address Marion T's claim for back rent, TME agreed to pay Marion T $80,000 and leave behind the

---

[1] Diversity jurisdiction exists under 28 U.S.C. § 1332(a). Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (Docket # 18.)

equipment it had not, or could not, sell.

In negotiating for removal of some of the equipment by TME (or its customers), and at the same time identifying the equipment TME would leave behind for Marion T, Lester Lee, Marion T's Manager, and, Donald Kruschke, TME's President, created what essentially became three drafts of an agreement. While most of the terms remained the same over time, the various drafts reveal that Lee and Kruschke were primarily concerned with whether Marion T or TME would get the items of equipment still in Marion T's building. In that regard, the lawyers for Marion T and TME came up with a simple concept: the agreement would list TME's equipment, and whatever was not on the list would stay in the building and go to Marion T.

Marion T's argument is straightforward: the first draft – the one both Lee and Kruschke eventually signed – accurately catalogs the equipment split, and therefore, the Court should declare it as controlling. But TME argues, and as the Court will ultimately find, Lee and Kruschke both signed that first draft by mistake, and because they really intended to sign the third draft (resulting in TME getting more equipment, and Marion T less), the Court should reform the agreement to match.

With this background, the Court makes the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).

## II. FINDINGS OF FACT[2]

In 2012, Marion T owned an old factory building in Marion, Indiana, and leased part of it to TriEnda, a plastic pallet manufacturing company. (Am. Stip. Facts ¶¶ 2-4.) When TriEnda

---

[2] Any Finding of Fact deemed to be a Conclusion of Law is hereby incorporated into Section III, and any Conclusion of Law in Section III deemed to be a Finding of Fact is hereby incorporated into this Section.

failed, its specialized – indeed, in some instances, unique – equipment was sold through a secured asset sale to another entity, Lexington Logistics. (Am. Stip. Facts ¶¶ 4-5.) The equipment and former TriEnda assets were eventually purchased from Lexington by TME for $1.5 million (Tr. 25), and TME then in turn worked to find a plastic pallet maker who might buy them. (Am. Stip. Facts ¶ 6.)

Plastic pallet manufacturing equipment is big and has a limited market, so TME left the equipment in Marion T's building while soliciting buyers. (Tr. 67-71, 75, 96-102.) Eventually, TME was able to sell some of the equipment to both Formal and Vantage Plastics. (Tr. 83, 85-86; Jim Jones Dep. 36.)

In May 2012, having arranged for the sale of some of the equipment, TME was faced with two remaining disputes: Marion T's claim that Lexington owed it rent on the building, and TME's own legal squabble in an Ohio state court with Lexington over ownership of the TriEnda equipment. (Tr. 32-48, 70-71, 88; Ex. 21; *see also* Am. Stip. Facts ¶¶ 8-9.) In an effort to reach a global solution, Marion T and TME agreed to split up the equipment, with TME to leave some of the equipment behind and pay Marion T $80,000 to boot for what the parties characterized as back rent. (Am. Stip. Facts ¶ 10; Tr. 82.)

Although TME arguably did not owe Marion T any rent, when Kruschke told Lee that he had already sold some equipment–in particular, the temperature control units ("TCUs")–for $80,000, that became the so-called rental amount in the agreement. (Tr. 82-83, 89-93, 96-98, 102-03.)

After visiting the factory, Kruschke sent Lee two emails on May 9 and 10 attempting to describe the equipment he had sold and wanted to remove (with the understanding that Marion T

3

would keep the rest). (Exs. 1, 18.) Inexplicably, the two emails, drafted at the same time, describe some critical equipment differently. (Exs. 1, 18.) For instance, the May 9th email listed TME as receiving, "2 [B]rown thermoformers[3] . . . 2 Cumberland 100 hp grinders and all [TCUs] on each thermoformer," but the May 10th email ambiguously linked the TCUs to the grinders, not the thermoformers. (Exs. 1, 18.) Afterward, in an effort to reach a clear understanding about what equipment TME wanted from Marion T's building and what it would leave behind, Kruschke and Lee visited the site together, followed by a conference with Marion T's attorney, Joseph Certain.[4] (Tr. 75-80, 89.) Nevertheless, it seems that Certain later used Kruschke's flawed May 10th email as the basis for drafting TME's equipment list in the first, rough draft of the agreement.

The negotiations between Lee and Kruschke about the equipment spanned several days, and culminated on May 17, 2012. (*See* Tr. 12-17, 80, 93.) Certain and the attorney for TME, James DeRoche, became mere scriveners as the various versions of the agreement, essentially three overall, flew back and forth. (Tr. 39, 126.) Aside from TME's equipment list and whether the $80,000 rental was in full or partial payment of the building rent, the three drafts are similar. (*See* Exs. 4, 6, 14.) In fact, even the subsequent equipment lists are largely the same as Certain's first, rough draft, as they all allot to TME the following equipment:

- Two Brown thermoformers with cooling tunnels;
- Spare parts for the west thermoformer;

---

[3] The thermoformers are made in Beaverton, Michigan, by Brown Machine. (Tr. 100.)

[4] Lee denies the visit occurred or that there was any such meeting with Certain. (Tr. 22-23.) Certain recalls that there was a meeting, but is hazy about the date and details. (Tr. 117-18.) Kruschke's version, which is recounted in detail, and perhaps partially corroborated by Certain, is the most credible version and is adopted.

- Bus ducting from the west thermoformer to a transformer;
- Cumberland 100 HP grinders;
- Scrap, regrind, floor sweepings, and other like parts;
- One CMM machine;[5] and
- One plastimeter.[6]

(*See* Exs. 4, 6, 14; Tr. 119.)

On the other hand, the second and third drafts, which were never signed, added to TME's equipment list some roof-mounted air conditioning units and, perhaps most critically, the TCUs. (*Compare* Ex. 4, *with* Exs. 6, 14.) At trial, Kruschke, who has experience in the specialized field of plastic manufacturing, convincingly explained that all the equipment in the second and third drafts of the agreement (in particular, the TCUs's, the air conditioning units, and the bus ducting) were necessary for operation of the two Brown thermoformers.[7] (Tr. 68-70, 82-83, 93, 97-98, 101-02.)

As Kruschke explained, the TCUs, the grinders, and the air conditioning units are specially designed to work with the thermoformers as a unit for the high speed production of plastic pallet parts. (Tr. 67-68, 98-101.) The twenty-four TCUs per thermoformer heat the mold through circulating water, and after the plastic part is formed, they use water to cool it so the part can be removed and trimmed. (Tr. 67, 98-99.) Although new TCUs are available, Kruschke,

---

[5] For some reason, Lee will not let TME remove the coordinate measuring machine (the "CMM") even though it was on TME's equipment list from the start. (Ex. 1; Tr. 51-52.)

[6] A plastimeter is a small desktop unit that measures the strength and heat characteristics of the plastic. (Tr. 69.)

[7] There are only three such thermoformers in the world. (Tr. 93.)

who regularly buys and sells such equipment, observed, and credibly so, that it would be nearly impossible to find even three (let alone forty-eight) used TCUs all of the same brand, age, and size.[8] (Tr. 83, 101-02, 109.) Perhaps this scarcity is why Kruschke, by the time he entered into negotiations with Lee, had already sold both sets of TCUs for $80,000. (Tr. 82.)

In any event, on the morning of May 17th, Certain, since he was unfamiliar with plastic manufacturing equipment, used Kruschke's May 10th email as a guide for preparing the first draft of the agreement, which he then sent to DeRoche. (Tr. 118-19; Exs. 4, 5.) Paragraph two of the agreement provided that TME would pay Marion T $80,000 "in *partial satisfaction* of rent for the occupancy of the building." (Ex. 4 (emphasis added).) Critically, however, paragraph three, which was the equipment list, confusingly described one item that TME was to receive as the "Cumberland 100 HP Grinders and *all temp control units on each grinder* including the temp control units from the Maac Thermoformer[.]"[9] (Ex. 4 (emphasis added).) The recital is confusing because in the plastic manufacturing industry, and perhaps in others, grinders do not have TCUs. (Tr. 81, 98.)

In response, DeRoche sent Certain an amended draft with several changes. (Ex. 6; Am. Stip. Facts ¶ 18.) Specifically, paragraph two was amended to show that the $80,000 was in full payment of all past and future rent until the equipment was removed. (Ex. 6.)

Like Certain, DeRoche presumably knew little about plastic manufacturing equipment, so he probably consulted with Kruschke, and then recast the agreement to more accurately describe the equipment that TME wanted: "Two Brown Thermoformers with cooling tunnels, *two 40 ton*

---

[8] AEC of Wisconsin makes the TCUs. (Tr. 100-01.)

[9] By this time, TME already had removed the Maac Thermoformer and sold it. (Tr. 70-71.)

6

*air conditioning units that feed the cooling tunnels . . . . All temperature control units on each Thermoformer including the temperature control units for the previously removed Maac Thermoformer.*" (Tr. 84; Ex. 6 (emphasis added).) With the equipment now correctly realigned from the inartful description in Certain's rough draft, Kruschke emailed DeRoche's amended version to Lee. (Ex. 7; Am. Stip. Facts ¶ 19.)

In response, Certain then prepared and emailed to Lee a new, third draft, along with DeRoche's amended draft. (Ex. 9; Am. Stip. Facts ¶ 21.) Certain's version became the final draft the parties considered, and it only slightly modified paragraphs two and three. Now, paragraph two once again provided that TME was to pay "Eighty Thousand ($80,000.00) in *partial satisfaction* of rent for occupancy of the building" and added a rental term of "until *June 30, 2012*.[]" (Ex. 9 (emphasis added).) And paragraph three was amended to add to TME's list: "Two Brown Thermoformers with cooling tunnels and *roof mounted a/c units attached* to the machine and *all temp control units*[, and] the temp control units from the Maac Thermoformer." (Ex. 9 (emphasis added).)

Since Certain was only authorized to put Lee's negotiated terms into legal language (Tr. 39), it is unlikely he would have taken upon himself to add the TCUs and the air conditioners to TME's equipment list without Lee's knowledge and approval. And it is odd that Lee, who was in control of the negotiations, did not immediately send the drafts back to Certain if, as he now maintains, they were fundamentally wrong about the equipment TME was to receive.[10] Instead, he sent a copy of the final draft to Kruschke solely, he says, to alert Kruschke that he would not

---

[10] Except for clinging doggedly to the improbable story that he and Kruschke had detailed negotiations, but at the last minute knowingly signed a marked-up document that had, up to that point, been cast-aside as a rough draft, Lee seems to have a vague or selective memory (Tr. 37-40, 41-47, 53-57) and an overall disputatious nature. In short, his testimony lacked credibility, which is why it has been, for the most part, rejected.

7

sign it, even though that presumably important point is strangely missing from his email. (Ex. 10.)[11] Since the equipment lists in both the DeRoche amended draft and Certain's final version were now essentially the same, Lee's forwarding of Certain's final version signaled acceptance of the list and that is certainly how Kruschke took it. Now, all that remained was a relatively small point: where and how the bus ducting would be removed from the transformer, and who would pay for it. (Tr. 84, 87-88, 90-93, 114-15.) That issue soon became the topic of their next phone conversation.

After Lee emailed Certain's final draft to Kruschke (Ex. 10), they each emailed the other a copy so they had the same document during their upcoming phone conference.[12] (Tr. 54-55, 84, 91, 111-12.) During his phone call with Lee, Kruschke reviewed the final document on his computer screen. (Tr. 107, 115.) Importantly, Lee, who also had a copy, did not mention TME's equipment list (which by this time he had seen in both the DeRoche amended version and Certain's final version), nor did he specifically object to the addition of the TCUs and the air conditioning units. (Ex. 14.) Of course, it would have made no sense for Kruschke to agree to leave behind the TCUs or any other part of the transformer unit since he had just sold these unique items to a customer. (Tr. 92-93.)

---

[11] Lee's claim that he emailed Kruschke the final draft merely to voice his disagreement with it is also at odds with Certain's email to DeRoche later that evening attaching the final draft, which included some changes Lee wanted to make. (Ex. 12.) The fact that Lee requested changes, and that those changes only appear in the final draft, blunts Lee's assertion that he emailed Kruschke the final draft simply to show his disagreement with it.

[12] At trial, some confusion still remained over the various drafts of the agreement. (Tr. 84-85, 107, 110.) Although this produced a somewhat garbled record, it does not matter in the final analysis because the equipment lists are essentially the same in both DeRoche's amended, and Certain's final, versions. Although it is true that the two versions differ when it comes to whether the $80,000 payment was in full or partial satisfaction of the rent allegedly owed Marion T, the parties now agree that the equipment TME left behind was in lieu of any further rent. (Am. Stip. Facts ¶ 10.) And certainly, all versions of the agreement confirm that understanding. (*See, e.g.*, Ex. 4 ¶ 4; Ex. 14 ¶ 4.) In addition, the equipment left behind by TME was significant, as Kruschke, who certainly should know, estimated its value at upwards of $500,000. (Tr. 87.)

And any such resistance by Lee to the equipment list would have prolonged the negotiations, if not squelched them completely, but that did not occur because in fact Lee and Kruschke quickly completed their agreement. (Tr. 107.) And both sides had good reason for acting quickly: Kruschke had customers waiting for the equipment, and Lee wanted money. (Tr. 104, 107.) So, in their May 17 phone conference, Lee and Kruschke came to an agreement about removal of the bus ducting and any resulting repair obligations. (Am. Stip. Facts ¶ 26.) With that detail resolved, they had a final agreement. (Am. Stip. Facts ¶ 27.)

The next day, May 18, 2012, Kruschke instructed his assistant to print out a copy of the document he and Lee had reviewed and approved the previous day. (Tr. 84.) But instead of printing out Certain's final version, she mistakenly printed out Certain's first, rough draft. (Tr. 84, 92.) After returning from a meeting, Kruschke quickly looked at only that part of the document that required clarification–the part where the bus ducting modification needed to occur–and made the necessary handwritten additions. (Tr. 84, 92.) He then had it scanned and emailed to Lee. (Tr. 84.)

Since both Lee and Kruschke had just reviewed, and in fact had agreed upon Certain's final version of their agreement, Lee would not have suspected a last-minute switcheroo back to Certain's rough draft. So probably he just turned to Kruschke's handwritten additions, initialed them, and signed the document without further scrutiny.

Now it is true that Certain contends he received a call from Lee at some time on the 17th to express disagreement with both DeRoche's amended agreement and Certain's final draft, but the precise time of the call and the nature of Lee's objection is unclear. (Tr. 123-24.)

9

Nevertheless, at 7:19 that evening, Certain emailed DeRoche another copy of his final draft with the following message:

> [Lee] insists on working with the Agreement we prepared a couple of days ago. I attach[ed] the Agreement which contains two changes from that submitted this a.m.: add "until June 30, [2012"] to [the] end of para[graph] 2 and reworked language relative to the description [of] the items to be removed. [Lee] is particularly concerned about deleting language relating to the ownership of the equipment not removed [and] insists on it remaining [in] (para[graph] 4).

(Exs. 11, 12; Am. Stip. Facts ¶ 24; *see* Exs. 14, 15.)

At trial, Certain testified that he erroneously attached the final draft, not the rough draft he intended to attach; indeed, the email does ambiguously say that Lee wanted to work with "the Agreement we prepared a couple of days ago." (Tr. 123-26.) But Certain's recollection cannot be accurate, as the email describes the edits Lee wanted made, which only appear in the final draft–the very one he was sending. And Certain's testimony also underscores one vital point: Lee must have never fully read the document he signed because the things he presumably thought critical (*e.g.*, the June 30 rental term), and was insisting upon, do not appear in the signed document. (Tr. 45.)

The conclusion that Lee did not read the document beyond the interlineations is bolstered by his later actions surrounding the eventual removal of some of the equipment. Approximately a week after the contract was signed, one of TME's customers, Formal, arrived at Marion T's building to remove the equipment it had purchased from TME. (Jones Dep. 53.) Formal was there for nearly a month, working long hours every day to disassemble the huge thermoformer and to gather all spare parts. (Jones Dep. 30.) One of Lee's former employees, Jim Jones, was there to oversee that process. (Jones Dep. 38-40.)

Jones, who seemingly has no motive to lie (and whose testimony Lee never really challenges (Tr. 51)), credibly testified that Lee told him that after Formal removed the roof top air conditioning unit, Formal was to repair the hole that remained. (Jones Dep. 46-47, 63-64.) Thus, it is revealing that almost contemporaneously with executing the agreement, Lee made a statement that can only be reconciled with a belief that the final – not the signed agreement – controlled, as only there (and in DeRoche's amended draft) do the air conditioning units go to TME.  Certainly Lee would not have allowed Formal to take an air conditioning unit if he thought the agreement allocated that item to Marion T. (Tr. 93.)  Thus, it is apparent that Lee's conduct springs from his recall of the negotiations with Kruschke, and what he thought was memorialized in their resulting agreement.  In fact, two more months would pass before Lee ever reported the supposed theft of the equipment to the Marion police department. (Tr. 50-51.)

And it was not until even later, in October 2012, after TME's next customer, Vantage, attempted to remove the equipment it had purchased, and after Lee prevented it from doing so, that Kruschke discovered that he (and we now know, Lee) mistakenly signed the wrong agreement. (Tr. 85-86.)

### III.  CONCLUSIONS OF LAW

The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see* Fed. R. Civ. P. 57.  Before a court can decide whether a declaratory judgment is appropriate, however, it "must first determine whether the court has subject matter

jurisdiction, *i.e.*, whether the case present an actual controversy between the parties." *Basic v. Fitzroy Eng'g, Ltd.*, 949 F. Supp. 1333, 1337 (N.D. Ill. 1996).

To determine if there is an actual controversy the Court looks to if "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Molex Ind. v. Wyler*, 334 F. Supp. 2d 1083, 1086 (N.D. Ill. 2004) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

It is clear, of course, that the Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) as the parties are diverse–Marion T is an Indiana limited liability company with all its members domiciled in Indiana, and TME is an Ohio corporation with a principal place of business in Ohio–and the amount in controversy exceeds $75,000. (Am. Not. of Removal ¶¶ 4-8, 13-14.)  Moreover, there is an actual controversy between Marion T and TME concerning the ownership of the disputed equipment, and a declaratory judgment "will clarify and settle the disputed legal relationships and afford relief from the uncertainty and controversy that created the issues." *Nucor Corp. v. Aceros y Maquilas de Occidente S.A. de C.V.*, 28 F.3d 572, 578 (7th Cir. 1994) (finding declaratory judgment appropriate to determine the contractual obligations of parties); *Union Tank Car Co. v. Aerojet-General Corp.*, No. 05 C 2095, 2005 WL 2405802, at *6-7 (N.D. Ill. Sept. 27, 2005) (same).

Although there is an actual controversy between Marion T and TME, "a court may refuse to grant declaratory relief for prudential reasons." *Alcan Aluminum Ltd. v. Dep't of Rev. of Or.*, 724 F.2d 1294, 1298 (7th Cir. 1984).  "This is because 'there is no right to declaratory relief; a request for such relief is addressed to the discretion of the district court.'" *Molex Inc.*, 334 F.

12

Supp. 2d at 1088 (quoting *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 680 (7th Cir. 1992)). In deciding whether to grant a declaratory judgment, the Court considers five factors:

> (1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for *res judicata*'; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective.

*Nucor Corp.*, 28 F.3d at 579.

Here, the first, second, and fifth *Nucor* factors indicate that declaratory relief is appropriate. A declaratory judgment will clarify the contractual obligations of both Marion T and TME, establish the ownership of the disputed equipment, and no more effective alternative remedy exists. Moreover, although there is apparently a related suit pending in an Ohio state court, procedural fencing does not seem to be an issue and there is no suggestion that this case will encroach upon, or cause friction with, the Ohio state court. In fact, aside from the parties mentioning the related Ohio state court litigation, and that it was filed around the same time, that case has prompted little discussion. Accordingly, because the *Nucor* factors weigh in favor of granting declaratory relief, the Court will exercise its jurisdiction over the claims.

Turning to the merits, Marion T asks that the Court declare the signed document as the contract that governs the rights and legal relations of Marion T and TME, particularly for the equipment catalogued there.

In response, TME says that the signed document is not the real contract, but rather something that neither party agreed to or fully read. Rather, according to TME, the real meeting

13

of the minds occurred on the evening of May 17 when Lee and Kruschke both looked at Certain's final draft and discussed the anticipated bus ducting interlineations. Consequently, TME wants the Court to declare that as the agreement, or reform the signed document as necessary.[13]

With such a dispute, it is best to start with some basic principles; that is, a binding contract requires an offer, acceptance, and a meeting of the minds between the contracting parties.[14] *Pohl v. United Airlines, Inc.*, 110 F. Supp. 2d 829, 837 (S.D. Ind. 1999). "A meeting of the minds occurs when the parties have the same intent." *DeGroff v. MascoTech Forming Techs.-Fort Wayne*, 179 F. Supp. 2d 896, 903 (N.D. Ind. 2001) (citing *Wallem v. CLS Indus., Inc.*, 725 N.E.2d 880, 883 (Ind. Ct. App. 2000)). And "[a]lthough some form of assent to the terms of the contract is necessary, 'the validity of a contract is not dependant upon the signature of the parties.'" *Id.* (quoting *Int'l Creative Mgmt., Inc. v. D & R Entm't Co.*, 670 N.E.2d 1305, 1312 (Ind. Ct. App. 1996)).

Applying Indiana substantive law in this diversity action, *RLI Insurance Company v. Conseco, Inc*., 543 F.3d 384, 390 (7th Cir. 2008), leads to the proposition that "[i]n cases involving mutual mistake, such as this one, the party seeking reformation must establish by clear and convincing evidence 'the true intention of the parties to an instrument, that a mistake was made, that the mistake was mutual, and that the instrument therefore does not reflect the true

---

[13] *See* Pretrial Order 2 (Docket # 30), adopted by the Court at the Pretrial Conference (Docket # 31). Although reformation was not expressly raised in either the pleadings, or in the pretrial order, it nevertheless was tried by consent of the parties. Fed. R. Civ. P. 15(b)(2).

[14] Marion T continues to argue that the signed agreement is the only evidence of a meeting of the minds that the Court needs, indeed, all that it may even look to. (Pl.'s Post Trial Br. 5-7.) The Court previously rejected that argument when it was advanced in Marion T's unsuccessful motion for summary judgment, siding with TME's position that parol evidence is admissible to demonstrate mutual mistake. (Docket # 28.) Indeed, whether a mutual mistake occurred in the signing of Certain's rough draft was the focus of the trial.

intentions of the parties.'" *Hudson v. Davis*, 797 N.E.2d 277, 283 (Ind. Ct. App. 2003) (quoting *Estate of Reasor v. Putnam Cnty.*, 635 N.E.2d 153, 158 (Ind. 1994)); *Heritage Techs., L.L.C., v. Philbro-Tech., Inc.,* 1:05-cv-1851-LJM-WTL, 2008 WL 45380, at *8 (S.D. Ind. Jan. 2, 2008). And if TME can show mistake, that is, the intent of the parties was incorrectly reduced to writing, then through reformation the Court may effectuate their true, common intent. *Hudson*, 797 N.E.2d at 283 (citing *Pearson v. Winfield*, 313 N.E.2d 95, 99 (Ind. Ct. App. 1974)).

But Marion T says that TME's case cannot squeeze into the narrow parameters of a mutual mistake because only Kruschke made the mistake of failing to read the contract before signing it. Marion T's argument, however, oversimplifies the law and misstates facts.

Marion T is correct, of course, that under Indiana law, a court should not reform a signed agreement in favor of a party who simply failed to read it, *Gierhard v. Consol. Rail Corp.-Conrail*, 656 N.E.2d 285, 287 (Ind. Ct. App. 1995); or who failed to read it but signed it anyway based on what others represented it to be, *Holly Stores, Inc. v. Jude*, 179 F.2d 730 (7th Cir. 1950); or whose interpretation of the agreement cannot be squared with its plain language, *Hudson*, 797 N.E.2d at 283-85. None of these situations are present here.

Rather, based on the Court's findings of fact, this case involved an intensely negotiated agreement that was read and re-read through its various iterations until the parties finally agreed on its contents, except for some needed, but relatively minor language about disconnecting a transformer from its electrical source. Through some sort of miscommunication, however, Kruschke's assistant printed out Certain's rough draft and placed it on his desk, instead of Certain's final version that both Lee and Kruschke had just reviewed. When he returned to sign it, Kruschke would not have suspected the inadvertent switch, and so he simply inserted the few

15

necessary words about the bus duct and sent it to Lee without reading it further. We know that Lee saw the inserts since he initialed them, but he too signed it without reading anything more. In this way, valuable, even critical, equipment was omitted from TME's list and fell into Marion T's unsuspecting lap.

These facts frame the ultimate question for resolution: Does Indiana law allow reformation where both parties reach an agreement on all the principal terms in a document, but then mistakenly sign another document that they only partially read and which provides for something materially different? Indiana law provides an affirmative answer to that question.

Under Indiana law, courts will reform an agreement where both parties failed to notice a typographical error or an omitted term from their executed agreement, provided the true intention of the parties is shown by clear and convincing evidence. *See Heritage Techs., L.L.C. v. Philbro-Tech, Inc.*, No. 1:05-cv-1851, 2007 WL 2406907, at *3 (S.D. Ind. Aug. 20, 2007) (denying plaintiff's motion for summary judgment because a material question of fact existed on whether there was a scrivener's error regarding pricing term); *Carlson v. Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos*, 895 N.E.2d 1191, 1199 (Ind. 2008) (collecting cases in which Indiana courts have reformed agreements due to mutual mistakes of fact and reforming trust agreement where plain language of trust agreement was contrary to parties' true intent); *Peterson v. First State Bank*, 737 N.E.2d 1226, 1230-31 (Ind. Ct. App. 2000) (affirming reformation of agreement to add omitted term caused by clerical error because extrinsic evidence showed that plaintiffs intended to sign agreement in their professional, not personal, capacity); *Sharp v. Jones*, 497 N.E.2d 593, 596-97 (Ind. Ct. App. 1986) (reforming payment term where parties' conduct subsequent to execution indicated agreement was signed without either party noticing a

16

scrivener's error); Ind. Law Encyc. *Reformation of Instruments* § 14 ("A mutual mistake may arise by erroneously omitting from the instrument words, or a provision, actually agreed on . . . .").

Perhaps the most applicable example of this overarching legal principle (because, like here, it involved an omitted term) is *Essex Group, Inc. v. Nill*, 543 N.E.2d 393, 396 (Ind. App. Ct. 1989), where a party argued that an agreement should be reformed because both sides failed to notice before signing it that the drafter had omitted a provision authorizing a lump sum payment. The Court agreed that due to the unnoticed scrivener's error – and because the extrinsic evidence (a letter outlining the agreement's provisions) showed that the lump sum provision was clearly intended – the agreement needed reformation. *Id*.

Likewise, the parties here agreed to Certain's final draft (subject to a few interlineations), but never noticed until much later the inadvertent substitution of his rough draft. As a result, Lee, because he did not read the switched document in full prior to signing it, never saw the omission of the June 30, 2012, rental term he wanted. And, Kruschke, who also did not read the document in full prior to signing it, never saw the missing TCUs and air conditioners. This is a textbook example of mutual mistake and a clear case for reformation. *Essex Group, Inc.*, 543 N.E.2d at 396; *Peterson*, 737 N.E.2d at 596; *see Beradi v. Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1262 (Ind. Ct. App. 1993) ("[A] mistake by a scrivener will permit reformation of an instrument if it is logically indicated that both parties were mistaken as to the actual contents of the instrument."); Restatement (Second) of Contracts § 155, illustration 2 (1979) (If A and B come to terms on a sale agreement, and in reducing the agreement to writing B mistakenly changes a

contract term and A fails to notice the error, the court will reform the agreement at the request of either party).

Nevertheless, Marion T argues that TME cannot meet its evidentiary burden of showing mutual mistake by clear and convincing evidence because Lee consistently objected to the removal of the disputed equipment. Specifically, Marion T points to Lee and Kruschke's negotiations prior to May 17, 2012, and Lee's actions during Formal's removal of its equipment as evidence that Lee never intended for TME to take the TCUs and air conditioning units.

Marion T's argument, however, ignores the record which conclusively shows that Lee and Kruschke intended, from the outset, to include the TCUs and air conditioning units in the list of equipment belonging to TME. Prior to May 17, Kruschke informed Lee that he had sold the TCUs; in fact, the parties used their sale price as the agreed amount for back rent. Moreover, Kruschke needed the TCUs as they had been designed specifically for the two Brown thermoformers, which would not work without them, and for $80,000, were virtually irreplaceable on the open market. Accordingly, Kruschke certainly would not have agreed to dropping such crucial equipment from his equipment list, and never would have signed a contract containing their omission.

Moreover, the course of negotiations between Kruschke and Lee clearly demonstrate they did not intend to sign the rough draft. For starters, the rough draft contains an obvious error in paragraph 3(c), as it links the TCUs to the grinders, something the parties quickly recognized and corrected in the next two drafts. And the almost immediate rejection of Certain's rough draft is evidenced by the fact that it was cast aside after DeRoche, and then Certain, circulated their amended drafts; that is, until it suddenly and inexplicably resurfaced as the signed document.

18

Thus, it is inconceivable that on May 17, Lee and Kruschke engaged in extended negotiations that amended the equipment list, but then scrapped those changes in favor of a rough draft that was, from their perspective, deeply flawed.

Furthermore, contrary to Marion T's assertion, Lee's conduct during Formal's removal of the equipment underscores the universal belief that TME was supposed to get the TCUs and air conditioning units. Indeed, soon after signing Certain's rough draft, Lee instructed his employee that Formal could take the roof mounted air conditioning unit so long as it repaired the hole created by its removal. Lee, who had just completed negotiations involving everything in the factory (right down to "floor sweepings" (*see, e.g.*, Ex. 17 ¶ 3(d))), would not have given that directive if he truly thought the air conditioner belonged to Marion T under the agreement.

In sum, Lee's and Kruschke's actions before, during, and after the contract negotiations, clearly and convincingly show that the initial, rough draft was mistakenly signed, and that the parties actually intended to agree to the terms in Certain's final draft (albeit, with the bus duct interlineations). Consequently, the agreement will be reformed accordingly.

## IV. CONCLUSION

For the reasons stated herein, the Court reforms the agreement of the parties and declares the third draft of the agreement between Marion T and TME (Ex. 10) as controlling, provided, however, it is reformed at paragraph 3(b) to say: "Only one bus ducting from west Thermoformer to Transformer or switch gear. Does not include transformer or switch gear. If affects any other

alarms, heat, lights, or other factory functions[,] client will repair or modify.  No bus duct to be removed on east Thermoformer." Accordingly, the Clerk is directed to enter a final judgment in favor of Thermoforming Machinery & Equipment, Inc., and against Marion T, LLC.

SO ORDERED.

Enter for this 17th day of July 2014.

/s/ Roger B. Cosbey<br>
Roger B. Cosbey<br>
United States Magistrate Judge