# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **MARION T LLC,** | ) | |
| | ) | |
| **Plaintiff/Counter Defendant,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:13-cv-00132-SLC** |
| | ) | **1:12-cv-00456-SLC**[1] |
| **FORMALL INC.,** | ) | |
| | ) | |
| **Defendant/Counter Claimant.** | ) | |

## OPINION AND ORDER

Plaintiff Marion T, LLC ("Marion T"), filed this suit against Defendant Formall, Inc. ("Formall"), claiming that Formall converted to its own use certain industrial equipment owned by Marion T.[2]  In turn, Formall advances a counterclaim of conversion against Marion T, claiming that Formall was the rightful owner of the equipment and that Marion T wrongfully withheld the equipment from Formall.

Now before the Court is a motion for summary judgment (DE 76) filed by Formall, contending that it is entitled to summary judgment in its favor on both Marion T's claim of conversion and on its own counterclaim of conversion.  The motion for summary judgment is fully briefed.  (DE 77; DE 80; DE 86).  Formall filed, together with its reply brief, a motion to strike (DE 87) portions of the affidavit of Lester Lee (DE 80-1), the manager of Marion T, which

---

[1] Unless otherwise noted, all docket entries ("DE") herein will refer to Case No. 1:12-cv-456.

[2] Marion T sued Formall in Grant County Superior Court; Formall later removed the case here, and the case was assigned No. 1:13-cv-132.  (No. 1:13-cv-132, DE 1).  The case was later consolidated for discovery purposes with Marion T's action against Thermoforming Machinery & Equipment, Inc. ("TME"), No. 1:12-cv-456, and the Magistrate Judge directed Formall and Marion T to make all filings in No. 1:12-cv-456, rather than in No. 1:13-cv-132.  (DE 14; DE 50; No. 1:13-cv-132, DE 22; No. 1:13-cv-132, DE 26).  Consequently, Formall's motion for summary judgment is pending in No. 1:12-cv-456, rather than in No. 1:13-cv-132.
Diversity jurisdiction exists under 28 U.S.C. § 1332(a).  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.  (DE 18).

Marion submitted with its response brief. Marion T did not file a response to the motion to strike, and its time to do so has now passed.

Because Marion T's opposition to the motion for summary judgment addresses evidence subject to Formall's motion to strike, the Court will first turn to that motion. For the following reasons, Formall's motion to strike will be GRANTED, and its motion for summary judgment will be DENIED.

## I. MOTION TO STRIKE

### A. Applicable Law

Federal Rule of Civil Procedure 56 states that affidavits filed in support of summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "An affidavit not in compliance with Rule 56 can neither lend support to, nor defeat, a summary judgment motion." *Paniaguas v. Aldon Cos.*, No. 2:04-cv-468-PRC, 2006 WL 2568210, at *4 (N.D. Ind. Sept. 5, 2006) (citing *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1148-49 (7th Cir. 1989); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)).

"[W]hen considering a motion to strike portions of an affidavit in support of a motion for summary judgment, courts will only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand." *Id.* (citations omitted); *see also Stromsen v. Aluma Shield Indus., Inc.*, No. 89 C 5036, 1993 WL 34727, at *4 (N.D. Ill. Feb. 8, 1993); *Toro Co. v. Krouse, Kern & Co.*, 644 F. Supp. 986, 989 (N.D. Ind. 1986); 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2738 (3d ed). Specifically, the following

statements are not properly included in an affidavit and should be disregarded: (1) conclusory allegations lacking supporting evidence, *see Young v. Monahan*, 420 F. App'x 578, 583 (7th Cir. 2011); (2) legal argument, *see Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985); (3) inferences or opinions not "grounded in observation or other first-hand experience," *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991); (4) mere speculation or conjecture, *see Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); and (5) statements in affidavits which blatantly contradict prior sworn testimony in an attempt to create sham issues of genuine dispute, *see Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 624 (7th Cir. 2002); *Bank of Ill. v. Allied Signal Safety Restraint, Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996).

## B. Analysis

Formall seeks to strike portions of Lee's affidavit on the grounds that Lee's testimony renders legal conclusions or contradicts his prior deposition testimony. (DE 87). Marion T failed to respond to the motion to strike, which is sufficient enough reason to grant it. *See generally Wojtas v. Capital Guardian Tr. Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (stating that failure to oppose an argument constitutes waiver). However, to complete the record, the Court will briefly address Formall's arguments.

Paragraph 10. Formall argues that in paragraph 10 of the affidavit, Lee testifies about the legal impact of the terms of the TriEnda Lease (defined *infra*) on the ownership of the disputed equipment. The Court agrees that Lee's testimony in paragraph 10 includes a legal argument and conclusion, as he concludes that the equipment installed by TriEnda, LLC ("TriEnda"), "immediately vested" in Marion T, and thus, that "all electrical equipment after that first junction box belonged to Marion T from the time of installation." (DE 80-1 at 2 ¶ 10). These statements

offer legal conclusions on the matters ultimately at issue in this dispute, and therefore, paragraph 10 will be stricken. *See, e.g.*, *Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum, LLC*, 779 F. Supp. 2d 858, 873-74 (N.D. Ind. 2011) (granting motion to strike portion of affidavit that concluded defendant's action constituted a breach of the contract at issue, finding that such testimony was a legal conclusion).

Paragraph 11 and Exhibit 2.  Formall contends that paragraph 11 and exhibit 2 to Lee's affidavit contain statements or conclusions that contradict the Court's prior ruling (DE 48) and Lee's prior deposition testimony (DE 87-1 at 2-5). *See Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 831 (C.D. Ill. 2010) (striking statements in a witness's affidavit that contradicted her prior deposition testimony).  Indeed, Lee attached a version of the Marion T Agreement (defined *infra*) as an exhibit to his affidavit, stating that it was the final version as determined by the Court; but as Formall points out, Lee attached an incorrect version of the Marion T Agreement.  Additionally, Lee seemingly quotes from the Marion T Agreement, but does so incorrectly.  As such, paragraph 11 and exhibit 2 will be stricken.

Paragraphs 13, 14, and 16.  Formall contends that the second sentence of paragraph 13 and portions of paragraphs 14 and 16 of Lee's affidavit contain legal argument and conclusion. In the second sentence of paragraph 13, Lee testifies about what equipment Formall was "entitled to remove" from Marion T's building.  Similarly, in paragraphs 14 and 16, Lee testifies about what items "were not covered by the [a]greement with TM & E" or "were not included in the transfer to Formall."  The Court agrees that these statements embrace the legal matters ultimately at issue in this dispute; therefore, the statements will be stricken. *See Bitler Inv. Venture II, LLC*, 779 F. Supp. 2d at 873-74.

*C. Conclusion*

Accordingly, Formall's motion to strike, which is unopposed by Marion T, is

GRANTED.  The Court now turns to Formall's motion for summary judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[3]

*A.  Marion T and TriEnda Enter Into the TriEnda Lease*

Marion T owned an industrial manufacturing storage facility located in Marion, Indiana.

(DE 48 at 2).  In December 2008, Marion T entered into a Lease Agreement ("the TriEnda

Lease") with TriEnda, a plastic pallet manufacturing company.  (DE 48 at 2; DE 80-1 at 5-16).

The term of the TriEnda Lease was four and a half years.  (DE 80-1 at 5 § 2).  The portions of

the TriEnda Lease applicable to this dispute are, in relevant part:

> **Article 7.  CARE OF PREMISES.** . . .  At the expiration of this Lease or
> any extensions hereof, Tenant shall surrender the Leased Premises, including any
> alterations, improvements and/or additions to the Leased Premises made by
> Tenant which are required to be left at the termination of this Lease . . . .
>
> **Article 11.  FIXTURES.**  Any trade fixtures belonging to and installed by
> Tenant in the Leased Premises prior to or during the term of this Lease, or any
> extensions hereof, are to be and remain the property of the Tenant, no matter how
> they may be attached to or incorporated in the Leased Premises, and Tenant shall
> have the duty to remove same at the termination of this Lease, or any extensions
> hereof, and to repair, at its own expense, any damage to the Leased Premises
> caused by the installation or removal of such fixtures.  Trade fixtures shall be
> manufacturing equipment and electrical wiring back to the first junction box or
> electrical service feed.
>
> **Article 12.  TENANT IMPROVEMENTS.**  Tenant may make such
> alterations to the Leased Premises as necessary for conduct of its business, after
> submission of plans, specifications and contracts to Landlord.  Any existing
> equipment or metals removed in the course of such improvement shall remain the
> sole property of Landlord.  All improvements (other than trade fixtures) inure to

---

[3] For summary judgment purposes, the facts are recited in the light most favorable to Marion T, the nonmoving party.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

the benefit of Landlord.

(DE 80-1 at 7-9 §§ 7, 11, 12).

### B. TME Purchases the TriEnda Equipment Located in Marion T's Building

TriEnda's business venture eventually failed, and Lexington Logistics purchased the TriEnda equipment located in Marion T's building. (DE 48 at 1). Lexington Logistics then sold this equipment to TME, a broker in the business of buying and selling industrial equipment. (DE 48 at 1). Don Kruschke, TME's president, was TME's representative in the transactions relevant to this dispute. (DE 48 at 2; DE 41 at 65). In its transaction with Lexington Logistics, TME purchased:

> 2 2009 Brown 9.5' x 17' Twinsheet Rotary Therm[o]formers Model R244ETF
> Serial numbers _____ & _____
>
> Included: All contents of Spara Industries/TriEnda plant located in Marion, IN facility. To include: Vacuum pumps, vacuum tanks, schematics, manuals, chillers, temperature control units, compressors, all clamp frames, miscellaneous spare parts and tools pertaining to Brown Thermoformers, Excluding Maac twinsheet thermoformer and all KMT robots and routers.

(DE 77-1 at 10). The equipment remained in Marion T's building while Kruschke solicited buyers for the equipment. (DE 77-2 at 3).

### C. TME and Formall Enter Into the Formall Agreement

Kruschke starting negotiating with Formall, who is in the thermoforming industry, to purchase a portion of the TriEnda equipment that TME had purchased (DE 77-6 at 2 ¶ 8; DE 77-5 at 2); Formall intended to install the thermoforming equipment in its Tennessee facility (DE 77-6 at 2 ¶ 12). Formall's director of operations, Christopher Krohn, traveled to Marion T's building to view the west thermoformer, the spare parts inventory, and available auxiliary equipment that TME had purchased from TriEnda. (DE 77-2 at 3; DE 77-5 at 2-5).

On March 23, 2012, TME and Formall executed an agreement (the "Formall Agreement"), stating that Formall would purchase the following equipment from TME for the price of $890,000:

| Quantity | Description |
|---|---|
| 1 | **2009 Brown 114 x 210 4 Station Twin Sheet Thermoformer**<br>To Include Vacuum Pumps and Cooling Tunnels<br>Scamatics [sic], manuals, clamp frame, vacuum pumps |
| 24 | **EAC Temperature Control Unit the Bank with Brown Thermoformer**<br>3000 AMP Power Panel<br>Conveyors in front of machine (and to side of machine)<br>Wiring from switch gear to machine to include bus bar from switch gear to Power Panel<br>ALL Brown spare parts<br>1) if more than 24 temp control units are located in bank at the thermoformer, the additional units will be included in this purchase |

(DE 77-6 at 6). The purchase price of this thermoformer, which the parties refer to as the "west thermoformer," and included equipment was $850,000;[4] the remaining equipment, including the spare parts, was priced at $40,000. (DE 77-6 at 6). The terms of payment were $100,000 deposit, $150,000 due April 5, 2012, and the balance of $640,000 due April 20, 2012. (DE 77-6 at 6). The purchase price of $890,000 was "to be paid before buyer takes possession." (DE 77-6 at 6).

Although TME was the owner of the equipment, it used a form contract appropriate when brokering a purchase for another party. As such, the "payment terms" section of the Formall Agreement read, in relevant part: "TM&E shall obtain a bill of sale from the Owner, in a form reasonably acceptable to Buyer. Upon receipt of the full installment, TM&E shall . . . deliver the

---

[4] TME sold the other TriEnda thermoformer, which the parties refer to as the "east thermoformer," and some of the other equipment it had obtained from TriEnda to Vantage Plastics. (DE 48 at 3; DE 77-2 at 3).

bill of sale to Buyer . . . . The equipment will remain on the market up to the day of full funds are received." (DE 77-6 at 7). The parties added a handwritten term stating that Formall warranted the equipment was being transferred free and clear of any liens or encumbrances. (DE 77-6 at 7).

### D. TME and Marion T Enter Into the Marion T Agreement

Having arranged for the sale of some of the equipment that it had obtained from TriEnda, TME faced two remaining disputes: Marion T's claim that Lexington Logistics still owed it back rent on the building, and TME's own legal dispute with Lexington Logistics in an Ohio state court over ownership of the TriEnda equipment. (DE 48 at 3). In an effort to reach a global resolution of these issues, TME agreed to pay $80,000 to Marion T and to leave behind some of the equipment it had purchased from TriEnda. (DE 48 at 3).

On May 21, 2012, Marion T and TME executed an agreement (the "Marion T Agreement") giving TME the right to remove the following equipment from Marion T's facility:[5]

    3. TM & E shall remove and sell only the following items of equipment:
        a. Two Brown Thermoformers with cooling tunnels and roof mounted a/c units attached to the machine and all temp control units the temp control units from the Maac Thermoformer
        b. spare parts currently in the building for the west Thermoformer only.
        c. Only one buss ducting from the west Thermoformer to Transformer or switch gear. Does not include transformer or switch gear. If affects any other alarms, heat, lights, or other factor functions[,] client will repair or modify. No buss duct to be removed on east Thermoformer.
        d. Cumberland 100 HP Grinders including cyclone dust collectors. All material including scrap, regrind, floor sweepings, rejected parts, finish sheets, finished

---

[5] Marion T's claims against TME were founded on Marion T's belief that it was entitled to more equipment than what was left by TME. (DE 1). After a bench trial (DE 40), the Court found that the parties had mistakenly executed an earlier version of the Marion T Agreement, and thus, the Court reformed the terms of the Marion T Agreement to reflect the list of equipment set forth herein. (DE 48).

parts, all plastics materials in the building.

    e.  One CMM Machine

    f.  One plastimeter. ("specified equipment")

4. In further satisfaction for occupying the building, all the right, title and ownership of the equipment, other than that specified (and except tooling) shall be the exclusive property of Marion T.

5. The specified equipment shall be removed at the expense of TM & E at the first electrical disconnect.

(DE 26-1 at 34-37, as reformed by DE 48 (alteration in original); *see* DE 77 at 5-6 (citing Tr. Ex. 10)).

### E. *Formall Removes the Equipment from Marion T's Building*

When Formall was enroute to remove the purchased equipment from Marion T's building, Formall was informed that Marion T would not let them enter the building because there was no electricity. (DE 77-5 at 6-7). Formall and Marion T then agreed on another date for the removal of the equipment that was approximately two weeks later. (DE 77-5 at 6-7). This new date was on or about May 2012, but the record does not reflect the date with specificity. (*See* DE 77-5 at 6-7; DE 77-2 at 4).

When Formall arrived at the building to remove the equipment, the building was without power and water. (DE 77-5 at 7; DE 77-3 at 3). Some of the spare parts for the west thermoformer had been removed from the operational area of the machine where they had been when Formall first viewed the equipment. (DE 77-5 at 8; DE 77-3 at 3). Also, Marion T had stacked up skids in front of the doors to the two rooms that held the spare parts for the east and west thermoformers to prevent Formall from entering these rooms. (DE 77-5 at 8; DE 77-2 at 2-3). Jim Jones, Marion T's onsite employee, blocked the doors to the spare parts rooms at Lee's directive, as Lee told Jones that Formall was not to take any of the spare parts. (DE 77-5 at 8;

DE 77-2 at 2-3).

Formall took three and a half weeks to disassemble the west thermoformer and load the equipment.[6] (DE 77-2 at 2; DE 77-5 at 6). When Jones was away from the building over Memorial Day weekend, Formall moved the skids barring the doors to the east spare parts room, which held the spare parts for the east thermoformer, and the west spare parts room, which held the spare parts for the west thermoformer, and took everything in both rooms. (DE 77-2 at 2, 4; DE 77-3 at 3). When Jones learned this, he came to the building and confronted Formall, stating that there were items in the spare parts rooms that were not spare parts to the thermoformers. (DE 77-2 at 4). Jones then made Formall put everything back that he thought was not a spare part to a thermoformer. (DE 77-2 at 4-5).

As such, Formall took everything that Jones considered to be a spare part to the west or the east thermoformer. (DE 77-2 at 5). Jones stated that he let Formall take all of the spare parts (despite Lee's earlier directive to the contrary) because he did not want to bother Lee on a holiday, and because he had called Kruschke of TME on an earlier date when Formall first "started messing with the spare parts," and Kruschke told him to let Formall take the spare parts and that Kruschke would clear it with Lee. (DE 77-2 at 5). Formall also removed a significant portion of the bus duct to the west thermoformer, but the record is unclear as to exactly how much. (DE 77-3 at 2). Formall claims that Marion T refused to allow Formall to take all of the bus duct to the west thermoformer. (DE 77-3 at 2).

---

[6] Marion T initially would not give Formall access to the building 24 hours a day as agreed upon, instead limiting it to 40 hours a week, which caused Formall to fall significantly behind in its schedule for the equipment removal (DE 77-5 at 7-8); eventually, however, Formall began working 12 hours a day, seven days a week. (DE 77-2 at 2). Jones was onsite each weekday, and he hired two other men to be present on the weekends and evenings. (DE 77-2 at 4).

Lee learned on the Tuesday after Memorial Day that Formall had taken all of the spare parts to both the east and the west thermometers and also much of the bus duct to the west thermoformer. (DE 77-2 at 5-6). Approximately six weeks later, on July 16, 2012, Lee filed a police report stating that TME and Formall had stolen his property. (DE 77-2 at 6).

*F. The Equipment Giving Rise to the Parties' Claim and Counterclaim of Conversion*

Marion T and Formall agree that the following items are no longer part of Marion T's conversion claim: the temperature control units and system, the chillers, the conveyors, the control equipment, and the spare parts for the west thermoformer.[7] Consequently, Marion T's conversion claim centers on: (1) the bus duct, power panels, and bus bar to the west thermoformer (the "Bus Duct"); (2) the spare parts for the east thermoformer (the "East Spare Parts"); (3) skid with brass fittings, skid of stainless steel fittings, skid of brass/stainless steel, and miscellaneous parts (nuts, bolts, and fittings) from the east spare parts room (the "East Miscellaneous Parts"), which Marion T contends are not spare parts to the east thermoformer; and (4) a wooden lazy Susan, four Lawson cabinets, eight cabinets with bins, three lockable cabinets, a roll-around ladder, an air conditioner tool bench, and miscellaneous parts (nuts, bolts, and fittings) from the west spare parts room (the "West Miscellaneous Parts"), which Marion T contends are not spare parts to the west thermoformer. (DE 1-1 at 5-6). In turn, Formall's counterclaim of conversion is based on the remaining Bus Duct from the west thermoformer that Marion T would not allow Formall to remove. (DE 86 at 12; DE 77-3 at 2).

---

[7] Although Marion T also included six vacuum pumps and a vacuum pump system in its list of stolen equipment attached to its complaint (No. 1:13-cv-132, DE 1-1 at 5), it does not discuss these items in its brief. Moreover, the language of the Formall Agreement suggests that these are part of the thermoformer. (*See* DE 77-6 at 6). As such, the Court presumes that these items, too, are no longer at issue.

## III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* (citations omitted). The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* (citations omitted). However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771 (citation omitted).

## IV. DISCUSSION

### A. *Elements of a Conversion Claim Under Indiana Law*

"The elements necessary to establish a civil cause of action for conversion are similar to those in the criminal conversion statute and, like all civil claims, must be proven by a preponderance of the evidence." *Meridian Fin. Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1058 (S.D. Ind. 2011) (citing *McKeighen v. Daviess Cty. Fair Bd.*, 918 N.E.2d 717, 723 (Ind. Ct. App. 2009)). "To prove conversion, a plaintiff must demonstrate that the defendant 'exert[ed]

unauthorized control over property of another[.]'" *Id*. (alterations in original) (quoting Ind. Code § 35-43-4-3).

To elaborate, under Indiana law, the tort of conversion "consists either in the appropriation of the personal property of another to the party's own use and benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or in withholding it from his possession, under a claim and title inconsistent with the owner's." *Nat'l Ass'n of Sys. Adm'rs, Inc. v. Avionics Sols., Inc.*, No. 1:06-cv-159-SEB-JMS, 2008 WL 140773, at *14 (S.D. Ind. Jan. 10, 2008) (quoting *Computs. Unlimited, Inc. v. Midwest Data Sys., Inc.*, 657 N.E.2d 165, 171 (Ind. Ct. App. 1995)). "Unlike with criminal conversion, mens rea is not an element of tortious conversion." *Meridian Fin. Advisors, Ltd.*, 763 F. Supp. 2d at 1058 (citing *Nat'l Ass'n of Sys. Adm'rs, Inc.*, 2008 WL 140773, at *14).

### B. Title to the Disputed Equipment

The parties agree that under Indiana law, a purchaser of goods acquires all title to which the purchaser's transferor had power to transfer. Ind. Code § 26-1-2-403(1). The parties disagree, however, as to who first obtained title to the disputed equipment and became the rightful owner of the equipment, nullifying the other's subsequent purchase. Formall argues that title to the equipment passed to it from TME on March 23, 2012, the date the Formall Agreement was executed, and that the first date that Marion T could possibly have obtained title was two months after that on May 21, 2012, the date of the Marion T Agreement. But Marion T argues that it acquired ownership of the equipment in 2009 by operation of the TriEnda Lease, and thus, that TME never had title to pass to Formall on March 23, 2012. The Court will begin with

13

Marion T's arguments.

1.  Any Title of Marion T to the East Spare Parts, the East Miscellaneous Parts, and the West Miscellaneous Parts Was Obtained on May 21, 2012, Through the Marion T Agreement

Marion T argues that, through the terms of the TriEnda Lease, Marion T obtained title to the disputed equipment in 2009 when TriEnda installed the equipment in the building. Thus, as Marion T sees it, TME never had ownership in the disputed equipment to pass to Formall on March 23, 2012.

Specifically, Marion T asserts that pursuant to Article 12 of the TriEnda Lease, "any existing equipment in the facility remained the sole property of Marion T." (DE 80 at 2). Marion T's paraphrasing of the Lease, however, overreaches. Article 12 of the TriEnda Lease, which addresses tenant improvements, allowed TriEnda to alter the premises as necessary to conduct its business, further stating that "[a]ny existing equipment or metals removed in the course of such improvement shall remain the sole property of the Landlord." (DE 80-1 at 9 § 12). Thus, Article 12 pertains to equipment that Marion T owned *before* TriEnda altered the building and which TriEnda may have removed to make alterations. It does *not*, as Marion T suggests, give Marion T ownership over all of the equipment that TriEnda brought into the building.

Articles 7 and 11 of the TriEnda Lease are more on point. Article 7 states that TriEnda surrendered to Marion T "any alterations, improvements and/or additions to the Leased Premises made by Tenant which are required to be left at the termination of this Lease . . . ." (DE 80-1 at 8 § 7). In turn, Article 11 provides that any trade fixtures belonging to or installed by TriEnda were to remain TriEnda's property no matter how they were incorporated or attached to the

premises. (DE 80-1 at 9 § 11). Article 11 further defines the term "trade fixtures" as "manufacturing equipment and electrical wiring back to the first junction box or electrical service feed." (DE 80-1 at 9 § 11). Setting aside the parties' dispute about the Bus Duct for the moment, there is no reasonable reading of the TriEnda Lease that creates an ownership right for Marion T in the East Spare Parts, the East Miscellaneous Parts, or the West Miscellaneous Parts.

Moreover, although the recitals to the Marion T Agreement reflect a dispute between TME and Lexington Logistics concerning the ownership of the TriEnda equipment, the recitals state that Marion T only claimed "a right of rental payment for the occupancy of the building." (DE 80-1 at 1). In fact, the Marion T Agreement provided that in partial satisfaction for the back rent, Marion T received "all the right, title and ownership of the equipment," with the exception of the agreed-upon equipment to be removed by TME. (DE 26-1 at 36 ¶ 4, as reformed by DE 48). It defies logic, then, that Marion T would have entered into an agreement to obtain title to assets *that it already owned*.

Clearly, no reasonable juror could conclude that Marion T obtained ownership to the East Spare Parts, the East Miscellaneous Parts, and the West Miscellaneous Parts from TriEnda through the terms of the TriEnda Lease. Rather, the only reasonable conclusion is that any rights Marion T had to the East Spare Parts, the East Miscellaneous Parts, and the West Miscellaneous Parts first arose on May 21, 2012, through entering into the Marion T Agreement.

2. On this Record, Formall Does Not Establish That Title to the Equipment Passed to It Before TME Executed the Marion T Agreement

Having concluded that any title of Marion T to the East Spare Parts, the East Miscellaneous Parts, and the West Miscellaneous Parts arose on May 21, 2012, the Court turns

to Formall's argument that title to all of the disputed equipment (that is, the East Spare Parts, the East Miscellaneous Parts, the West Miscellaneous Parts, and the Bus Duct) passed to Formall before then—on March 23, 2012, when it executed the Formall Agreement with TME. In support of this argument, Formall cites Indiana Code § 26-1-2-401(3), which states: "Unless otherwise explicitly agreed, where delivery is to be made without moving the goods: . . . (b) if the goods are at the time of contracting already identified and no documents of title are to be delivered, title passes at the time and place of contracting." Formall argues that the Formall Agreement does not specify where title would transfer, does not require delivery of documents of title, and stated that delivery was to be made without moving the equipment, and therefore, pursuant to Indiana Code § 26-1-2-401(3), title to the equipment passed to Formall on March 23, 2012. (DE 77 at 9; DE 77-6 at 2 ¶ 9).

But the plain language of the Formall Agreement does not support Formall's assertion that title to the disputed equipment passed to it on March 23, 2012. As stated earlier, the Agreement required that Formall pay a $100,000 deposit, $150,000 due April 5, 2012, and the balance of $640,000 due on April 20, 2012. (DE 77-6 at 6). The "payment terms" section of the Agreement stated: "Upon receipt of the full installment, TM&E shall . . . deliver the bill of sale to Buyer . . . . The equipment will remain on the market up to the day of full funds are received." (DE 77-6 at 7). Thus, the parties "explicitly agreed," Ind. Code § 26-1-2-401(3), that title to the equipment would pass when Formall paid the full amount of the purchase price.

The record is silent, however, as to when Formall actually paid the balance of the purchase price for the equipment. Yet, Formall must have paid in full before it removed the equipment in or about May 2012, as the Formall Agreement required that Formall pay the

balance before taking possession of the equipment. (DE 77-6 at 6). The specific date that Formall paid the balance matters: if Formall paid the balance before May 21, 2012, the date of the Marion T Agreement, then title to the equipment passed first to Formall; however, if Formall paid the balance after May 21, 2012, then title passed first to Marion T.

Of course, on a motion for summary judgment, all facts and reasonable inferences must be construed in favor of Marion T, the nonmoving party. *See Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008). Here, Formall's assertion that it received title to the East Spare Parts, the East Miscellaneous Parts, the West Miscellaneous Parts, and the Bus Duct on March 23, 2012, is defied by the explicit language of the Formall Agreement. Nor does Formall provide other evidence—such as copies of payments or a bill of sale—for the Court to discern when title to the equipment may have passed. Consequently, on this record, the Court cannot conclude that title to the disputed equipment passed to Formall on March 23, 2012, as Formall argues, or even more critically, whether title passed to Formall before TME and Marion T entered into the Marion T Agreement on May 21, 2012. This issue, standing alone, precludes summary judgment. *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) ("The party pursuing the [summary judgment] motion must make an initial showing that the agreed-upon facts support a judgment in its favor." (collecting cases)).

### C. Whether The Term "ALL Brown Spare Parts" Includes the East Spare Parts

Even if the record was clear as to which party first obtained title to the disputed equipment, the parties' dispute would still not be completely resolved because they also disagree about the scope of equipment transferred. To resolve that issue, the parties ask that the Court interpret certain provisions of the TriEnda Lease, the Formall Agreement, and the Marion T

Agreement to determine what equipment was, or was not, included in these agreements. The Court will begin with the parties' dispute about the East Spare Parts.

Marion T's conversion claim is based, in part, on its belief that Formall wrongly took the East Spare Parts.[8] The parties disagree, however, whether TME sold to Formall all of the spare parts for both thermoformers, as Formall contends, or whether TME sold to Formall only the spare parts to west thermoformer, as Marion T asserts.

1. The Parties' Proffered Interpretations of the Disputed Term

The Formall Agreement reflects that Formall purchased from TME, in relevant part, a "2009 Brown 114 x 210 4 Station Twin Sheet Thermoformer" and "ALL Brown spare parts." (DE 77-6 at 6). The parties agree that Formall purchased only the west thermoformer, but Formall urges that the Formall Agreement unambiguously reflects that it purchased all of the spare parts to *both* thermoformers. Conversely, Marion T contends that "ALL Brown spare parts" means all of the spare parts for the west thermoformer that Formall was purchasing, but not the East Spare Parts. Marion T urges that this interpretation is consistent with the terms of the Marion T Agreement executed two months later, which allowed TME to remove and sell "spare parts currently in the building for the west Thermoformer only." (DE 26-1 at 36 ¶ 3, as reformed by DE 48; *see* DE 77 at 5)).

_____

[8] As concluded above, no reasonable juror could conclude that Marion T had an ownership interest in the East Spare Parts prior to May 21, 2012. Having disposed of that argument, the parties do not otherwise dispute that TME owned the East Spare Parts when it entered into the Formall Agreement on March 23, 2012.

2. Rules of Contract Interpretation[9]

"[T]he goal of contract interpretation is to ascertain the parties' intent." *BKCAP, LLC v. CAPTEC Franchise Tr. 2000-1*, 572 F.3d 353, 359 (7th Cir. 2009) (citations omitted); *see Nikish Software Corp. v. Manatron, Inc*., 801 F. Supp. 2d 791, 800 (S.D. Ind. 2011); *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, 867 N.E.2d 203, 212-13 (Ind. Ct. App. 2007). "In the case of a written contract, the parties' intent is determined by looking first to the plain and ordinary meaning of the contract language." *BKCAP, LLC*, 572 F.3d at 359 (citing *USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997)).

"If the contract language is clear and unambiguous, the document is interpreted as a matter of law without looking to extrinsic evidence." *Id.* (citations omitted). "The Court must read the contract as a whole, construing language to give meaning to all of the contract's words, terms, and phrases." *BMD Contractors, Inc. v. Fid. & Deposit Co. of Md.*, 828 F. Supp. 2d 978, 984 (S.D. Ind. 2011) (citing *Trustcorp Mortg. Co.*, 867 N.E.2d at 213). "If, however, the contract language is ambiguous, an examination of relevant extrinsic evidence is appropriate in order to ascertain the parties' intent." *BKCAP, LLC*, 572 F.3d at 359 (citations omitted).

"A controversy between the parties concerning the proper interpretation of contract terms does not necessarily indicate that the terms are ambiguous." *Bowman v. Int'l Bus. Machs. Corp*., 853 F. Supp. 2d 766, 770 (S.D. Ind. 2012) (citing *Kiltz v. Kiltz*, 708 N.E.2d 600, 602 (Ind. Ct.

---

[9] Formall cites the Indiana rules of contract construction in its briefs, and Marion T does not oppose Formall's doing so. The TriEnda Lease and the Marion T Agreement are silent as to governing law, but the Formall Agreement states it is to be interpreted in accordance with Ohio law. (DE 77-6 at 7). The Ohio rules of contract construction, however, are similar to Indiana's rules, *see Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762-65 (6th Cir. 2008); *Mulch Mfg., Inc. v. Advanced Polymer Sols., LLC*, 947 F. Supp. 2d 841, 857-58 (S.D. Ohio 2013), and thus, the Court will cite to Indiana law in this Opinion and Order. (*See* DE 28 at 4 ("The Court's analysis reveals there are no differences between the relevant Indiana and Ohio laws that would affect the outcome of this litigation")).

App. 1999)).  "Rather, language is ambiguous only if reasonable people could come to different conclusions about its meaning."  *Felker v. Sw. Emergency Med. Serv., Inc*., 521 F. Supp. 2d 857, 867 (S.D. Ind. 2007) (citing *Roy A. Miller & Sons, Inc. v. Indus. Hardwoods, Corp*., 775 N.E.2d 1168, 1173 (Ind. Ct. App. 2002)); *accord Nikish Software*, 801 F. Supp. 2d at 800; *Ind. Dep't of Transp. v. Shelly & Sands, Inc*., 756 N.E.2d 1063, 1069 (Ind. Ct. App. 2001).

"Generally, the construction of a written contract is a question of law for which summary judgment is particularly appropriate."  *Automation By Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 753 (7th Cir. 2006) (quoting *Orthodontic Affiliates, P.C. v. Long*, 841 N.E.2d 219, 222 (Ind. Ct. App. 2006)).  However, if the terms of a written contract are ambiguous, it "must be set before a trier of fact to ascertain the facts necessary to construe the contract."  *Id*. (citing *Orthodontic Affiliates*, 841 N.E.2d at 222); *accord Freiburger v. Bishop Dwenger High Sch*., 569 N.E.2d 755, 758 (Ind. App. 1991).  Consequently, "[w]hen a court grants summary judgment it has necessarily determined that the contract is not ambiguous or that any existing ambiguity can be resolved without the aid of a factual determination."  *Automation By Design, Inc.*, 463 F.3d at 753 (citing *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 687 (Ind. Ct. App. 2006)); *accord City of Lawrenceburg v. Milestone Contractors, L.P.*, 809 N.E.2d 879, 883 (Ind. Ct. App. 2004).

3.  The Term "ALL Brown Spare Parts" in the Formall Agreement Is Ambiguous

Applying these rules of contract interpretation, the Court concludes that reasonable people could come to different conclusions about the meaning of the term "ALL Brown spare parts" as used in the Formall Agreement.  *See Felker*, 521 F. Supp. 2d at 867.  The Oxford English Dictionary defines "all" as: "The whole amount, quantity, extent, or compass of; the

20

whole of." Oxford English Dictionary, http://www.oed.com/view/Entry/5151 (last visited Mar.

30, 2016). Here, it is reasonable to conclude, as Formall urges, that the term was intended to

mean all of the spare parts to any Brown thermoformer *in the building*. But it is also reasonable

to conclude that the term was intended to mean all of the spare parts to the Brown thermoformer

*that Formall was purchasing*—the west thermoformer. As such, the term is ambiguous, and the

relevant extrinsic evidence must be examined to determine the intent of Formall and TME when

entering into the Formall Agreement. *See BKCAP, LLC*, 572 F.3d at 359.

    4. The Court Is Unable to Interpret the Term "ALL Brown Spare Parts" on This Factual
Record

    Formall cites several pieces of extrinsic evidence to support its proffered interpretation of

the term "ALL Brown spare parts." Formall first points to the affidavit of Krohn, its director of

operations, who negotiated the Formall Agreement with Kruschke of TME. Krohn states that he

considered Formall's ability to purchase all of the Brown spare parts, regardless of whether they

were unique to the west thermoformer, as a significant benefit to the transaction. (DE 77-6 at 3 ¶

19). He further states that when considering the purchase, he traveled to the building and

examined the spare parts supporting the operation of the Brown thermoformers and understood

that Formall was purchasing all of the spare parts. (DE 77-5 at 5; DE 77-6 at 3 ¶ 19). This

extrinsic evidence supports Formall's argument that its intent was to purchase all of the Brown

spare parts in the building when it executed the Formall Agreement.

    But on this record, TME's intent for the East Spare Parts is less apparent. What is clear,

however, is that within two months after executing the Formall Agreement with Formall,

Kruschke negotiated the Marion T Agreement, which unambiguously reflects his intent to pass

title to the East Spare Parts from TME to Marion T.  This suggests that TME did not intend to sell all of the Brown spare parts to Formall, but rather, only the spare parts for the west thermoformer.  After all, Kruschke testified at the bench trial (*see* footnote 5 *supra*) that the only equipment he was willing to leave behind for Marion T were unsold assets.  (DE 41 at 87-88 ("The stuff I was willing to leave behind was the assets I didn't sell.  The assets I wanted, obviously, were the assets I had sold."); 91 ("Q.  Did you ever relay to Lester [Lee] or anyone at Marion T that you were in a position to let Marion T retain assets that you had already sold?  A. No, no; that would be wrong.  Absolutely not.  Not going to give assets away that I have already sold.")).  *See generally Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996) ("In reaching a conclusion as to the presence of a genuine issue of material fact [on a motion for summary judgment], we must view the evidence and draw all inferences in a way most favorable to the nonmoving party." (citation omitted)).

Although Jones ultimately let Formall take all of the spare parts, including the East Spare Parts, in part, because he had talked with Kruschke (DE 77-2 at 5), this does not necessarily reflect that Kruschke intended when he entered into the Formall Agreement for Formall to receive all of the Brown spare parts in the building.  It could be that Kruschke was just referring to the spare parts to the west thermoformer in his conversation with Jones.  Or Kruschke may not have initially intended to transfer all of the spare parts to Formall, but thought that he could still obtain Lee's subsequent agreement to the transfer.  In short, on the record presented, Kruschke's intent—and thus TME's intent—is unclear.

Considering all of the foregoing, the Court cannot interpret the term "ALL Brown spare parts" on the factual record presented, as the Court cannot discern the intent of Formall and TME

when entering into the Formall Agreement with respect to that term. As explained above, if the terms of a written contract are ambiguous, the contract "must be set before a trier of fact to ascertain the facts necessary to construe the contract." *Automation By Design, Inc.*, 463 F.3d at 753 (citing *Orthodontic Affiliates*, 841 N.E.2d at 222); *see also Freiburger*, 569 N.E.2d at 758. Therefore, the parties' dispute concerning the East Spare Parts will be reserved to the factfinder to ascertain the facts necessary to construe the intent of Formall and TME with respect to the East Spare Parts when entering into the Formall Agreement.

### E. Whether the Term "ALL Brown Spare Parts" Includes the Miscellaneous Parts

Marion T's conversion claim is further based upon its belief that Formall took items from the spare parts rooms that were not "Brown spare parts." These items are the East Miscellaneous Parts and the West Miscellaneous Parts that are more generic in nature, but were located with the spare parts to the thermoformers in the east and west spare parts rooms. TriEnda put the Miscellaneous Parts in the building to support the operation of the Brown thermoformers, but they were not unique to the machines.[10]

Applying the rules of contract interpretation articulated earlier, the Oxford English Dictionary defines a "spare part" as "[a] duplicate of a part of a machine kept or available in readiness to replace a loss, failure, or breakage." Oxford English Dictionary, http://www.oed.com/view/Entry/185653 (last visited Mar. 30, 2016). A reasonable person could conclude, based on the inclusion of the word "Brown" before the term "spare part," that the term

---

[10] To reiterate, having disposed of Marion T's argument that it acquired ownership in these East Miscellaneous Parts and West Miscellaneous Parts prior to TME through the terms of the TriEnda Lease, there is no dispute that TME owned the East Miscellaneous Parts and the West Miscellaneous Parts when it entered into the Formall Agreement on March 23, 2012.

was intended to mean only those spare parts specifically manufactured for a Brown thermoformer. However, the Formall Agreement identified the equipment that was being transferred in a rather cursory fashion, referring to simply broad categories; as such, it is also reasonable to conclude that the term was intended to include the more generic items relating to, and located with, the spare parts. Consequently, the term is ambiguous, *Felker*, 521 F. Supp. 2d at 867, and the relevant extrinsic evidence must again be examined to determine the intent of Formall and TME when entering into the Formall Agreement. *BKCAP, LLC*, 572 F.3d at 359.

As stated earlier, Formall cites Krohn's affidavit stating that he considered Formall's ability to purchase all of the spare parts associated with the thermoforming operation—"regardless of whether [the part] was unique to the [thermoformer] machine or 'generic'"—as a significant benefit to the transaction. (DE 77-6 at 3 ¶ 19). Krohn further states that when considering the purchase, he traveled to the building and examined both spare parts rooms and understood that Formall was purchasing all of the spare parts supporting the operation of the thermoformers. (DE 77-5 at 5; DE 77-6 at 3 ¶ 19). This extrinsic evidence supports Formall's argument that it intended to purchase *all* of the parts supporting the thermoformers— not just those parts specifically manufactured for a Brown thermoformer—when entering into the Formall Agreement.

As to Kruschke's intent on behalf of TME, the language of the Marion T Agreement allowed TME to remove "spare parts currently in the building for the west Thermoformer only." (DE 26-1 at 36 ¶ 3, as reformed by DE 48; *see* DE 77 at 5). Notably, the word "Brown" was not included in that term, suggesting that Kruschke intended for Formall to receive all of the spare parts that could be used for the thermoformer, regardless of whether they were generic or

manufactured specifically for the Brown machine. Consequently, the Court concludes that "ALL Brown spare parts" includes the generic nuts, bolts, and fittings that could be used in a thermoformer. As such, the Formall Agreement included the generic nuts, bolts, and fittings located in the west spare parts room and, if it is ultimately determined that Formall purchased the East Spare Parts, the generic nuts, bolts, and fittings in the east spare parts room.

However, the other West Miscellaneous Parts—the lazy Susan, Lawson cabinets, cabinets with bins, lockable cabinets, roll-around ladder, and an air conditioner tool bench—are less clear. These items were in the west spare parts room presumably to store (or with respect to the ladder, to reach) the spare parts. Yet, at least Jones included these items in the category of spare parts, as he testified that he made Formall put anything back that was not a spare part to a thermoformer. (DE 77-5 at 4-5). Ultimately, on the factual record presented, the Court cannot discern whether Formall and TME, when entering into the Formall Agreement, agreed to convey to Formall these items that related to, and were located with, the spare parts. Therefore, the parties' dispute concerning these items will be reserved to the factfinder to ascertain the facts necessary to construe the intent of Formall and TME when entering into the Formall Agreement. *See Automation By Design, Inc.*, 463 F.3d at 753 (citing *Orthodontic Affiliates*, 841 N.E.2d at 222); *Freiburger*, 569 N.E.2d at 758.

### F. The Bus Duct

The remaining equipment giving rise to Marion T's conversion claim and Formall's conversion counterclaim is the Bus Duct.[11] Marion T asserts that Formall converted Marion T's

---

[11] As defined earlier, the term "Bus Duct" includes the bus duct, the bus bar, and the power panels to the west thermoformer.

property by removing too much of the Bus Duct to the west thermoformer, contending that, at most, Formall was entitled to just 10 feet of Bus Duct as measured out from the thermoformer. Conversely, Formall asserts that Marion T converted Formall's property by refusing to allow Formall to remove all of the Bus Duct. (DE 77 at 6).

As background, the operation of thermoforming machines requires a large amount of electricity. (DE 77-6 at 1 ¶ 6). Delivering a sufficient amount of energy from a power source to a thermoformer requires either a large wire or a bus bar or bus duct. (DE 77-6 at 1 ¶ 6). Bus duct or bus bar is typically sold in 10-foot sections, which are pieced together to make up one long electrical conductor from a power source to a machine, with multiple connection points to access power. (DE 77-6 at 2 ¶ 7). The west thermoformer required approximately 5,000 amps of 460-volt electricity to operate at full capacity. (DE 77-6 at 2 ¶ 13). To deliver this much power, the west thermoformer had three separate segments of Bus Duct running from three power sources in the building to various power panels on the machine. (DE 77-6 at 2 ¶ 13). All of the Bus Duct for the west thermoformer was installed between the power panels and the building's power sources, with no Bus Duct existing between the thermoformer and the power panels. (DE 77-6 at 3 ¶ 18). The Bus Duct is necessary for the operation of the thermoformer. (DE 48 at 5).

The parties' dispute about the Bus Duct centers on the interpretation of certain terms in the TriEnda Lease, the Formall Agreement, and the Marion T Agreement. Turning first to the TriEnda Lease, it provides that any trade fixtures, defined as "manufacturing equipment and electrical wiring back to the first junction box or electrical service feed," remained the property of TriEnda; otherwise, the title to any alterations, improvements, or additions vested in Marion

T.  (DE 80-1 at 9 § 11).  Marion T argues that the "first junction box or electrical service feed" as used in the TriEnda Lease is the first electrical disconnect *as measured out from the thermoformer*, rather than as measured out from the building's power sources.

Marion T explains that each connection to the thermoformer had an electrical disconnect between the machine and the Bus Duct so that the machine could more easily be locked down for service or repairs.  (DE 80 at 5).  As Marion T sees it, this first disconnect between the thermoformer and the Bus Duct is the "first junction box or electrical service feed," and thus, Marion T obtained title to *all* of the Bus Duct when TriEnda installed it through operation of the TriEnda Lease terms.  (DE 80 at 5).  To support its argument, Marion T cites Lee's testimony (DE 77-4) and the affidavit of Joby Gibbons, a project manager and estimator for Rex Collins Electric, Inc., with 17 years of experience (DE 80-2).  Gibbons explains in his affidavit:  "[W]hat is typical in this type of installation is a switchboard at the machine end of the Square D Feeder Duct which is a disconnect or switch gear which could turn the power on and off and is then connected to the machine by an electrical cable.  This switch gear would be the first electrical disconnect from the machine."  (DE 80-2 at 2 ¶ 9).

Marion T contends that this interpretation is consistent with the terms of the Marion T Agreement, in which Marion T allowed TME to remove and sell: "Only one bus ducting from west Thermoformer to Transformer or switch gear.  Does not include transformer or switch gear. If affects any other alarms, heat, lights, or other factory functions[,] client will modify.  No bus duct to be removed on east Thermoformer."  (DE 48 at 19-20 (alteration in original)).  The Marion T Agreement further provided: "The specified equipment shall be removed at the expense of TM & E at the first electrical disconnect."  (DE 26-1 at 36 ¶ 5, as reformed by DE 48;

*see* DE 77 at 5). Marion T seizes on this "first electrical disconnect" language, stating that the terms "Transformer or switchgear" are thus referring to the first electrical disconnect as measured out from the thermoformer.

Marion T's argument, however, has some flaws. The most significant of which is that there was no Bus Duct between the thermoformer and the first electrical disconnect as measured out from the machine, rendering the first sentence of the term in the Marion T Agreement meaningless. (DE 77-6 at 3 ¶ 18; DE 80 at 5; DE 80-2 ¶ 9); *see Bowman v. Int'l Bus, Machs. Corp.*, 853 F. Supp. 2d 766, 769 (S.D. Ind. 2012) ("[The Court] . . . should make every effort to avoid a construction of contractual language that renders any words, phrases, or terms ineffective or meaningless." (citing *Ind. Gaming Co., L.P. v. Blevins*, 724 N.E.2d 274, 278 (Ind. Ct. App. 2000))). Marion T does not address this gap in its reasoning; instead, it merely asserts that Formall, then, "should be limited to one ten foot section because it comes in ten foot sections and the sections can be safely and reliab[ly] disconnected from the building's power." (DE 80 at 5).

Nor does Marion T's interpretation square with the Formall Agreement, which conveyed to Formall: "Wiring from switch gear to machine to include bus bar from switch gear to Power Panel." (DE 77-6 at 6). Again, if "switch gear" is construed to be the first electrical disconnect as measured out from the thermoformer, the inclusion of the bus bar in that term would also be pointless, as there was no Bus Duct between the first electrical disconnect from the machine and the thermoformer.

Turning to Formall's interpretation of these terms, it argues that the term "first junction box or electrical service feed" in the TriEnda Lease should be as measured from the other

end—the building's power source. It contends this is consistent with the term in the Formall Agreement that conveyed the Bus Duct "from switch gear to Power Panel." (DE 77-6 at 6). Formall relies on the affidavit of Krohn, its director of operations, who has 13 years of experience in the thermoforming industry. (DE 77-6). Krohn states that, in his experience, a "switch gear" is considered the first point of electrical disconnect after the building transformer and that the "power panel" is a place on the thermoformer where electricity enters the machine. (DE 77-6 at 2-3 ¶¶ 14-16). Krohn further states that it is uncommon to purchase only a section of a bus duct that powers a small portion of a large machine. (DE 77-6 at 3 ¶ 17).

But Formall's proffered interpretation also has flaws. Under the Marion T Agreement, TME was allowed to remove and sell: "*Only one* bus ducting from the west Thermoformer to Transformer or switchgear. Does not include transformer or switchgear." (DE 48 at 19-20 (emphasis added)). Here, it is undisputed that there were *three* separate segments of Bus Duct running from three power sources in the building to various power panels on the west thermoformer. (DE 77-6 at 2 ¶ 13; DE 77 at 3). So why did Kruschke, who negotiated the Marion T Agreement for TME, agree to remove and sell "[o]nly one" Bus Duct in the Marion T Agreement (DE 26-1 at 36 ¶ 3, as reformed by DE 48; *see* DE 77 at 5), if he had sold all three sections of Bus Duct to Formall in the Formall Agreement? As stated earlier, Kruschke's trial testimony made it clear that he had no intention of conveying assets to Marion T that he had already sold to another entity. (DE 41 at 87-88, 91).

Because of the ambiguity and uncertainty of the terms concerning the Bus Duct in the TriEnda Lease, the Formall Agreement, and the Marion T Agreement, the Court finds that the meaning of the terms concerning the Bus Duct need to be determined by weighing extrinsic

evidence and assessing credibility of witnesses.  *See Entm't USA, Inc. v. Moorehead Commc'ns, Inc.*, 93 F. Supp. 3d 915, (N.D. Ind. 2015) ("[I]f language of the contract is ambiguous, or if technical words, local phrases or terms of art are used and evidence is properly admitted showing meaning, the question becomes one of fact." (alteration in original) (quoting *Ecorp, Inc. v. Rooksby*, 746 N.E.2d 128, 131 (Ind. Ct. App. 2001))).  "As such, its construction is a matter for the factfinder."  *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995) (citation omitted); *see Payne*, 337 F.3d at 770 (stating that when ruling on a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a fact finder" (citations omitted)).  "Rules of contract construction and extrinsic evidence need to be employed to determine and give effect to the parties' reasonable expectations."  *Fresh Cut, Inc*., 650 N.E.2d at 1133 (citation omitted).  Under such circumstances, resolution of the parties' dispute concerning the Bus Duct is inappropriate for summary judgment.  *See id.*; *see, e.g.*, *BKCAP, LLC*, 572 F.3d at 362 (reversing the district court's entry of summary judgment and concluding that the meaning of an ambiguous contractual term was a question of fact that required examination of relevant extrinsic evidence); *LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co.*, 722 F. Supp. 2d 1015, 1022-23 (N.D. Ind. 2010) (finding summary judgment inappropriate where an ambiguous contract term required that the fact finder consider the parties' extrinsic evidence to determine and give effect to the parties' reasonable expectations).

Therefore, Formall's motion for summary judgment will be DENIED.

## V.  CONCLUSION

For the foregoing reasons, Formall's motion to strike (DE 87) is GRANTED, and its

motion for summary judgment (DE 76) is DENIED.  The Court will set this matter for a

scheduling conference to determine a date for a bench trial.

SO ORDERED.

Enter for this 30th day of March 2016.

/s/ Susan Collins              
Susan Collins,
United States Magistrate Judge