# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| **MARION T LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CAUSE NO. 1:12-cv-00456-SLC** |
| | ) |
| **FORMALL INC.,** | ) |
| | ) |
| **Defendant,** | ) |

## OPINION AND ORDER

Plaintiff Marion T, LLC ("Marion T"), filed this suit against Defendant Formall, Inc.

("Formall"), claiming that Formall converted certain spare parts, miscellaneous items, and bus

duct owned by Marion T and located in Marion T's facility.[1]  Formall, in turn, advances a

counterclaim of conversion against Marion T, claiming that Formall was the rightful owner of

this equipment and that Marion T wrongfully withheld a portion of the bus duct from Formall.

On March 30, 2017, the Court entered an Opinion and Order on Formall's motion for summary

judgment, identifying the issues that remained for trial:  (1) whether Formall removed from the

Marion T facility certain spare parts and miscellaneous items that Marion T owned; and (2)

whether Formall removed from the Marion T facility a portion of the bus duct that Marion T

owned, or conversely, whether Marion T withheld from Formall a portion of the bus duct that

Formall owned.

These Findings of Fact and Conclusions of Law follow a three-day bench trial held on

---

[1] Marion T sued Formall in Grant County Superior Court; Formall later removed the case here, and the case was assigned No. 1:13-cv-132.  (No. 1:13-cv-132, DE 1).  Case No. 1:13-cv-132 was later consolidated with this case, No. 1:12-cv-456, which was Marion T's action against Thermoforming Machinery & Equipment, Inc. ("TME").  (DE 14; DE 50; No. 1:13-cv-132, DE 29).
Diversity jurisdiction exists under 28 U.S.C. § 1332(a).  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.  (DE 18).

June 26-28, 2017, on the parties' competing claims of conversion. (DE 116-DE 118). Following the preparation of a transcript (DE 119-DE 121),[2] the parties submitted proposed findings of fact and conclusions of law (DE 124-DE 125). Formall timely filed a response (DE 126) to Marion T's proposed findings of fact and conclusions of law. Marion T, however, did not file a response to Formall's proposed findings of fact and conclusions of law, and its time to do so has passed. (*See* DE 123).

After examining the entire record, considering the arguments of counsel, and determining the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a) based upon a preponderance of the evidence.

## I. FINDINGS OF FACT[3]

### A. *Marion T Purchases the Thompson/RCA Site*

Lester Lee ("Lee") was the manager of Marion T at the time of the events pertinent to this suit, and he testified on Marion T's behalf.[4] (Tr. 25). Lee, who has a high school

---

[2] Reference to the trial transcript is made as "Tr. __" and trial exhibits as "Ex. __".

[3] Any Finding of Fact deemed to be a Conclusion of Law is hereby incorporated into Section II, and any Conclusion of Law in Section II deemed to be a Finding of Fact is hereby incorporated into this Section.

[4] Lee has given conflicting information about the ownership of Marion T. Lee stated in an affidavit and at his deposition that Marion T is an Indiana limited liability company solely owned by The Lee Group Holding Company, LLC, whose members are Brenda R. Lee, Larry L. Lee, Melinda L. Gabbard, and Debra Jo Brown, all citizens of Indiana. (Tr. 78; DE 9-2). However, at trial, he admitted on cross examination that he may have testified in another litigation that he owned Marion T himself. (Tr. 79-80). When asked whether he had ever been an owner of Marion T, he stated that he just could not recall. (Tr. 79-80).

Lee's difficulty recalling factual details was noted throughout the trial, as Lee was often vague in his testimony or answered that he could not recall. Lee's testimony also revealed several contradictions (*see, e.g.*, Tr. 67-69 (who paid for the installation of the bus duct), 79-81 (ownership of The Lee Group Holding Company, LLC), 114-15 (claiming that the temperature control units were converted), 125-26 (whether the two Brown thermoformers were identical)). Overall, Lee's testimony was not particularly credible. In fact, the credibility of his testimony was not dissimilar to his testimony at the trial between Marion T and TME in 2014, where the Court determined: "Lee seems to have a vague or selective memory and an overall disputatious nature. In short, his testimony lacked

education, has started and owned more than 100 companies, including Lee's Inns of America, a public company with 400 employees; gold mine operations in Yukon territory; and oil wells in Kentucky.  (Tr. 19, 21).  Some of his past businesses involved setting up offices internationally, including in Russia.  (Tr. 21).

In March 2005, Marion T purchased for one dollar the former "Thompson/RCA" television factory site in Marion, Indiana, including the industrial manufacturing building in which the equipment in dispute was housed.[5]  (Tr. 22, 32, 44; DE 113 Stip. 1).  The site was 62 acres and had over one million square feet under roof.  (Tr. 22).  Thompson/RCA left everything except patentable items because the equipment and parts had become obsolete.[6] (Tr. 22, 28, 44).  Marion T's business at the facility consisted of salvaging items from the former operations of Thompson/RCA.  (Tr. 44-45).

### B.  Marion T and TriEnda Enter Into the TriEnda Lease

In December 2008, Marion T entered into a Lease Agreement ("the TriEnda Lease") with TriEnda, LLC ("TriEnda"), a plastic pallet manufacturing company, leasing 183,808 square feet of the Marion T facility to TriEnda for a term of four and a half years.  (DE 113 Stip. 4; Ex. 6; Tr. 26-27).  TriEnda was the only tenant at the time.  (Tr. 239).  TriEnda paid $2.50 per square foot per year, received the first six months rent free, and TriEnda was to pay

---

credibility, which is why it has been, for the most part, rejected."  (DE 48 at 7 n.10 (citations omitted)).

[5] Lee stated that the utility bills for the Thompson/RCA site were costing the seller hundreds of thousands of dollars a month, and thus, the seller made money by selling it to Marion T for one dollar.  (Tr. 24).

[6] Marion T sold off one piece of the Thompson/RCA site for $4.2 million and gifted the City of Marion the balance of the property for $5.4 million.  (Tr. 22).  Thus, Marion T paid one dollar and received more than $10 million in value in return.  (Tr. 23).

the utility bills, the maintenance, the taxes, and any expenditures that the building would need.[7]

(Tr. 26-27; Ex. 6).

The portions of the TriEnda Lease applicable to this dispute are, in relevant part:

> **Article 7.  CARE OF PREMISES**. . . .  At the expiration of this Lease or any extensions hereof, Tenant shall surrender the Leased Premises, including any alterations, improvements and/or additions to the Leased Premises made by Tenant which are required to be left at the termination of this Lease . . . .

> **Article 11.  FIXTURES.**  Any trade fixtures belonging to and installed by Tenant in the Leased Premises prior to or during the term of this Lease, or any extensions hereof, are to be and remain the property of the Tenant, no matter how they may be attached to or incorporated in the Leased Premises, and Tenant shall have the duty to remove same at the termination of this Lease, or any extensions hereof, and to repair, at its own expense, any damage to the Leased Premises caused by the installation or removal of such fixtures.  Trade fixtures shall be manufacturing equipment *and electrical wiring back to the first junction box or electrical service feed.*

> **Article 12.  TENANT IMPROVEMENTS.**  Tenant may make such alterations to the Leased Premises as necessary for conduct of its business, after submission of plans, specifications and contracts to Landlord.  Any existing equipment or metals removed in the course of such improvement shall remain the sole property of Landlord.  All improvements (other than trade fixtures) inure to the benefit of Landlord.

(Ex. 6 (emphasis added)).

---

[7] Lee testified that Marion T charged TriEnda $1 to $1.50 below market rate and gave it six months free rent because TriEnda was going to remodel the space and raise the height of the building by 10 or 12 feet in some areas, and because Marion T was going to obtain the ownership of the bus duct that TriEnda was installing.  (Tr. 27, 30-31, 67-68).  Lee acknowledged, however, that it is common for a lessor to give a slightly lower than market rate to get the first tenant into a building.  (Tr. 106).  Lee concedes that TriEnda never did raise the height of the Marion T facility.  (Tr. 239).

## C.  TriEnda Installs Three Thermoformers and Bus Duct at the Marion T Facility

TriEnda installed three large thermoformers—two of which were Brown thermoformers—into the leased space at the Marion T facility.  (Tr. 107, 266, 272).  Thermoformers are very complicated pieces of machinery with anywhere from 5000 to 10,000 parts, components, and pieces.  (Tr. 265).  Only one other Brown thermoformer of similar size existed in the world.  (Tr. 272, 367).  Each Brown thermoformer installed at the Marion T facility was roughly the size of a 3000 to 5000 square foot home with a footprint of about 100 feet by 100 feet and 22 feet tall.  (Tr. 266).

Thermoforming in general, and the Brown thermoformers in particular, require a lot of power.[8]  (Tr. 268).  Lee testified that the Marion T facility already had three substations, six powerhouses, transformers, and equipment that would service a large voltage and amps, but that TriEnda had additional electrical equipment installed.  (Tr. 27-28).  In particular, and most relevant to this dispute, Lee testified that TriEnda had bus duct[9] installed—which cost $203,000 at the time—to connect the two Brown thermoformers to the building's power source.[10]  (Tr. 27-28, 67-69, 107, 187).  The third thermoformer, a Maac, required wiring, but no bus duct.  (Tr. 107, 185-86).

## D.  Marion T Claims That It Stored Equipment in TriEnda's Leased Space

Lee testified that although Marion T still had about 800,000 square feet of its own

---

[8] In fact, running a large Brown thermoformer at full capacity requires an amount of power akin to that required by a small city.  (Tr. 268).

[9] Bus duct is sometimes referred to as "feeder duct," "bus bar," or "bus ducting."  (Tr. 197; Ex. 9).

[10] Lee's story as to who had the bus duct installed has shifted during the course of this litigation.  At his deposition in 2015, Lee testified that it was Marion T who had paid for and installed the bus duct.  (Tr. 67-69).

space at its disposal, Marion T stored certain equipment or items of value in an "east parts room" located within the space that it had leased to TriEnda. (Tr. 99-100, 137). Lee stated that he left the items there with TriEnda's permission because the items were out of the way and because it took a while to move some of them out. (Tr. 99-100, 137). However, at the trial between Marion T and TME in 2014 (DE 40), Lee was asked, "Was there was anything besides assets that TriEnda has brought to the facility and in the TriEnda spare part room?" to which, Lee responded, "Well, TriEnda leased it, and TriEnda, I assume, brought the parts there." (Tr. 138).

Jim Jones ("Jones"), Lee's property manager at Marion T, also testified. Jones, who has a high school education, had worked at Thompson/RCA for 27 years until it closed down. (Tr. 203-04). After that, he worked for Marion T, first doing demolition work and later as the site's property manager. (Tr. 204, 206). Jones testified that when TriEnda leased the space in 2007, there were still some "skids that had stuff on it," which included brass valves and similar parts that Marion T had salvaged from the Thompson/RCA operations. (Tr. 251-52). At his deposition, however, Jones testified that the Marion T facility was "[p]retty much vacant" when TriEnda leased the space in 2007, and that there were no equipment or parts left from Thompson/RCA that TriEnda had not used.[11] (Tr. 251-52).

### E. The Sale of the TriEnda Assets to TME

TriEnda's business venture eventually failed, and its assets were sold in a secured party

---

[11] Jones, too, had some credibility issues when testifying, as his testimony shifted at times, resulting in Jones contradicting himself or Marion T's stipulated facts on at least two points. (*See, e.g.*, Tr. 217-18 (stating that Formall removed all of the bus duct to the west thermoformer and no bus duct was left in the Marion T facility), 234-37, 246, 251-52 (contradicting himself about whether any Thompson/RCA items were left in the TriEnda leased space)).

sale to Spara LLC, which later became known as Lexington Logistics ("Spara/Lexington"). (DE 113 Stips. 2, 3). Spara/Lexington refused to pay rent on the Marion T facility and was later joined as a party to a lawsuit brought against TriEnda. (DE 113 Stip. 3). As part of a plant-wide liquidation, Spara/Lexington contracted TME to sell all of the former TriEnda assets and equipment located in the Marion T facility. (DE 113 Stip. 4). Plastic pallet manufacturing equipment is large and has a limited market. (Tr. 266, 272; DE 113 Stip. 5).

TME eventually purchased the former TriEnda assets from Spara/Lexington for $1.5 million. (DE 113 Stip. 4). TME then worked to find a plastic pallet maker who might buy the former TriEnda assets. (DE 113 Stip. 4). The TriEnda equipment remained in the Marion T facility while TME's owner and president, Donald Kruschke ("Kruschke"), solicited buyers for the equipment. (DE 113 Stip. 4).

*F. TME Starts Negotiating With Formall to Purchase Some of the TriEnda Equipment*

In February 2012, Kruschke started negotiating with Formall, a Tennessee-based custom manufacturer specializing in plastic thermoforming, sheet extrusion, metal fabrication, powder coating, and assembly, to purchase a portion of the TriEnda equipment that TME had purchased. (DE 113 Stip. 6; Tr. 272). Formall makes some of the biggest parts of any company in the thermoforming industry. (Tr. 265). Christopher Krohn ("Krohn"), Formall's director of operations, testified on Formall's behalf at the trial.[12] (Tr. 260, 269). Formall, which has about 200 employees, is owned by Krohn's family, but Krohn himself has no ownership in the company. (Tr. 260, 269). Krohn has worked for Formall for about 20 years

---

[12] Krohn presented as a knowledgeable witness in the area of thermoforming. He testified in detail about the facts relevant to the dispute, most of which he witnessed first hand, and his testimony had few, if any, contradictions or gaps in logic. In contrast to Lee, there were very few events or details that Krohn could not recall. Krohn presented as a very credible witness.

in various capacities, including running thermoforming machines and doing work with set up, maintenance, tooling, and engineering. (Tr. 260-61). Krohn has an undergraduate and a master's degree in applied mathematics with a focus on industrial statistics from the College of Business at the University of Tennessee. (Tr. 260).

Krohn was aware of TriEnda's work because TriEnda was a competitor of Formall. (Tr. 270). As part of the negotiations, Krohn went to TriEnda's facility in Portage, Wisconsin, to inspect a "sister machine" to the Brown thermoformers located at Marion T. (Tr. 273). Formall was interested in the Brown thermoformers at the Marion T facility because they were the largest twin-sheet thermoformers in existence. (Tr. 266). Krohn visited the Marion T facility on several occasions during the negotiations to inspect the TriEnda equipment that Formall was considering purchasing. (DE 113 Stip. 7).

### G. Formall Visits the Marion T Site to Inspect the TriEnda Equipment

Lee informed Jones that representatives from Formall would be coming to the Marion T facility to look at the west thermoformer. (Tr. 207). Lee told Jones to show Formall what they wanted to see, including all of the equipment and the parts that were laying around. (Tr. 207, 226). Lee never told Jones to inform Formall that certain items were not for sale. (Tr. 226).

Krohn traveled to the Marion T facility to inspect and take photos of the west thermoformer, the spare parts inventory, and the available auxiliary equipment that TME had purchased from TriEnda. (DE 113 Stip. 7; Tr. 273-74, 281-82). Krohn himself went to assess the Brown thermoformers because he had decommissioned and started up thermoformers for Formall; he estimates that he had moved 15 to 20 other thermoformers previously. (Tr. 267).

Krohn explained that unless the machine is very small, the disassembly, transportation, and reassembly of a thermoformer is a fairly complicated process involving not only the machine, but also its power supply.  (Tr. 267-68).

During the visit, Jones took Krohn and another person from Formall through different areas of the Marion T facility, including the west parts room, the east parts rooms, and the penthouse where the power supply came in.  (Tr. 207-08, 226).  Krohn and his colleague spent between three and four hours looking at the equipment, parts, and electrical supply during this visit.  (Tr. 208).  Formall representatives also made several subsequent visits to the Marion T facility to look at the TriEnda equipment.  (Tr. 209, 273).

Krohn testified that the west thermoformer consisted of a large rotary oven with loading/unloading stations, two oven (heating) stations, and a forming station.  (Tr. 274-80; Ex. E).  Krohn stated that he took a great deal of photos to document what Formall looked at and to aide in the disassembly and reassembly process.  (Tr. 281-82; *see* Ex. A).  Krohn was very interested in the TriEnda spare parts program and considered the spare parts to be an attractive, key part of the deal.  (Tr. 295).  He explained that Formall runs its manufacturing processes 24 hours a day, either five or seven days a week, and that thermoformers have thousands of parts that are constantly being repaired or needing preventative maintenance, making it a constant struggle to keep the machines operating 24 hours a day.  (Tr. 295-97).  Having a good spare parts program helps to keep the machines running in order to meet customer demands and  production schedules.  (Tr. 296-97).  Without an available spare parts program, Krohn would have had to create one at significant additional expense.  (Tr. 297).

Krohn also considered TriEnda's organization of the parts inventory to be important.

(Tr. 297-302).  TriEnda had a good spare parts program where the parts were organized in Akro Bins, Lawson cabinets, and other cabinets.  (Tr. 297-302; *see, e.g.*, Ex. A at 41).  Krohn testified that what Marion T referred to as the "west parts room" was actually more of a maintenance shop and main parts room for the thermoformers, while the "east parts room" was more of a bone yard of machine parts that could be retooled, scavenged, or used for the thermoformers.[13]  (Tr. 295, 303, 324-25, 457-58; Ex. A at 175-180).

Krohn testified that the two Brown thermoformers were identical, and that only three such thermoformers of that size existed in the world, making their parts interchangeable.  (Tr. 367).  Lee disagreed, testifying that while the two Brown thermoformers were similar, they were of different designs and configurations, making their spare parts unique to each thermoformer.  (Tr. 31, 130-33).  Lee admitted, however, that he has only a "basic knowledge" of thermoformers as a "lay person" and "doesn't understand it all."  (Tr. 125).  Furthermore, Lee testified at his deposition in 2013 that he did not know whether the two thermoformers were identical or not.  (Tr. 125-26).

### H.  *TME Contracts to Sell Some of the TriEnda Equipment to Formall*

On March 23, 2012, TME contracted to sell certain equipment, including one of the Brown thermoformers, to Formall for $890,000.  (DE 113 Stip. 8; Ex. 1).  The purchase order ("the Formall Agreement") described what Formall purchased as follows (including handwritten modifications):

---

[13] At one point, Lee asserted that the west parts room housed the spare parts to the west thermoformer, while the east parts room housed the spare parts to the east thermoformer, stating "[t]hat's what they told me anyway."  (Tr. 130-31).  However, at other points in his testimony, Lee described the two parts rooms as Krohn describes them—that the west parts room was used as a maintenance shop for servicing the thermoformers, and the east parts room was used more as a bone yard to store old parts.  (Tr. 45, 47, 59, 61, 93).  And Jones, too, referred to the two parts rooms as "the maintenance room or the parts room."  (Tr. 225-26, 228-29).

| 1 | **2009 Brown 114 x 210 4 Station Twin Sheet Thermoformer** | **$850,000.00** |
|---|---|---|
| | To Include Vacuum Pumps and Cooling Tunnels | |
| | Scamatics [sic], manuals, clamp frame, vacuum pumps | |

| 24 | **EAC [sic] Temperature Control Unit the Bank with Brown Thermoformer** | **$40,000.00** |
|---|---|---|
| | 3000 AMP Power Panel | |
| | Conveyors in front of machine and to side of machine | |
| | Wiring from switch gear to machine to include bus bar from switch gear to Power Panel | |
| | ALL Brown spare parts | |
| | 1) If more than 24 temp control units are located in bank at the | |
| | thermoformer, the additional units will be included in this purchase. | |

(DE 113 Stip. 8; Ex. 1). The thermoformer that Formall purchased was known as the "west" thermoformer and was located on the west side of the TriEnda space. (DE 113 Stip. 9; Ex. 7). The Formall Agreement provided that the equipment was being transferred free and clear of any liens or encumbrances. (DE 113 Stip. 12).

Formall paid TME for the equipment it purchased through four electronic payments dated March 23, 2012 ($100,000), April 5, 2012 ($150,000), and May 14, 2012 ($637,500 and $2,500). (DE 113 Stip. 13). Full funds for the equipment that Formall purchased were paid by Formall to TME as of May 14, 2012. (DE 113 Stip. 14). Therefore, title to the equipment that Formall purchased from TME passed to Formall no later than May 14, 2012. (DE 113 Stip. 15).

### I. TME Contracts to Sell the Other Brown Thermoformer to Vantage Plastics

On March 27, 2012, four days after the sale to Formall, TME contracted to sell the other Brown thermoformer, that is, the "east" thermoformer, to Vantage Plastics. (DE 113 Stips. 10, 11; Ex. 2). The purchase order ("the Vantage Plastics Agreement') describes what Vantage Plastics purchased as follows:

| 1 | **2009 Brown 114 x 210 4 Station Twin Sheet Thermoformer** | **$850,000.00** |
|---|---|---|
| | To Include Vacuum Pumps and Cooling Tunnels | |
| | Scamatics [sic], manuals, clam frame, vacuum pumps | |

| 30 | **AEC Temperature Control Units** | **$40,000.00** |
|---|---|---|

(DE 113 Stip 10; Ex. 2).  Vantage Plastics did not remove any bus duct from the Marion T facility.  (Tr. 108, 222).

### J.  TME, Spara/Lexington, and Marion T Enter Into the Marion T Agreement

After TME had sold the TriEnda equipment to third parties (Formall and Vantage Plastics), a dispute arose between TME and Spara/Lexington over the ownership of the equipment, which resulted in a lawsuit filed in the Cuyahoga County Court of Common Pleas, Case No. 779257.  (DE 113 Stip 16).  Meanwhile, Marion T's dispute with Spara/Lexington over unpaid rent was still pending.  (DE 113 Stip. 17).  In this context, Lee began strategizing closely with TME and its owner and president, Kruschke, to obtain compensation from Spara/Lexington.  (DE 113 Stip. 17).

TME, Spara/Lexington, and Marion T eventually entered into settlement negotiations to resolve their respective disputes in an effort to bring the overlapping claims against Spara/Lexington to a close.  (DE 113 Stip. 18).  The agreement between TME and Marion T was relatively simple:  TME would get the equipment specified in the agreement between TME and Marion T, TME would pay Marion T $80,000 to cover a portion of the rent due on the building, and the equipment not specified would be owned by Marion T in lieu of rent. (DE 113 Stip. 19).  TME, Spara/Lexington, and TME negotiated a contract that eventually was signed and dated May 18, 2012 ("the Marion T Agreement").[14]  (DE 113 Stip. 20).

---

[14]  In October 2012, after Vantage Plastics attempted to remove the equipment it had purchased and Lee prevented it from doing so, TME discovered that it and Marion T had signed the wrong version of the Marion T Agreement.  (DE 113 Stip. 29).  In litigation between Marion T and TME over the Marion T Agreement, this Court found that the version signed by Marion T and TME did not actually reflect their agreement.  (DE 113 Stip. 102; DE 48).  The Court then reformed the Marion T Agreement to declare the third draft of the Agreement was controlling. (DE 48).  The language from the Marion T Agreement included here is as reformed by the Court.

The Marion T Agreement provides that the following equipment was permitted to be removed and sold by TME:

3.      TM & E shall remove and sell only the following items of equipment:

    a.      Two Brown Thermoformers with cooling tunnels and roof mounted a/c units attached to the machine and all temp control units the temp control units from the Maac Thermoformer

    b.      spare parts currently in the building for the west Thermoformer only.

    c.      Only one bus ducting from the west Thermoformer to Transformer or switch gear. Does not include transformer or switch gear. If affects any other alarms, heat, lights, or other factory functions[,] client will repair or modify. No bus duct to be removed on east Thermoformer.

    d.      Cumberland 100 HP Grinders including cyclone dust collectors. All material including scrap regrind, floor sweepings, rejected parts, finish sheets, finished parts, all plastics materials in the building.

    e.      One CMM Machine.

    f.      One plastimeter. ("specified equipment")

4.      In further satisfaction for occupying the building, all the right, title and ownership of the equipment, other than that specified (and except tooling) shall be the exclusive property of Marion T.

5.      The specified equipment shall be removed at the expense of TM & E at the first electrical disconnect.

(DE 113 Stip. 30; Ex. 4; DE 48).

### K. Lee Directs Jones to Move Items and Barricade the Doors to the Parts Rooms

When Lee learned that Formall was coming to the Marion T facility to remove the equipment it had purchased, Lee directed Jones to stack skids in front of the doors to both parts rooms to prevent Formall from entering those rooms, and he also told Jones that Formall was not to take any spare parts. (DE 113 Stip. 22; Tr. 227). At trial, Lee claimed that this was to secure the area, so that "everybody [presumably, Vantage Plastics and Formall], got exactly

what they paid for."[15]  (Tr. 97).  Jones, at Lee's direction and with the help of his crew (all past

Thompson/RCA employees), moved items that had been shown to Formall during its visits into

the barricaded parts rooms or to the Marion T side of the building.  (Tr. 227-28).

Specifically, Jones claimed that he moved five to 10 skids of parts that Marion T had

salvaged from the Thompson/RCA operations out of the east parts room and into the Marion T

side of the building.[16]  (Tr. 227-28).  Jones stated that the only items that remained in the east

parts room were left from TriEnda.  (Tr. 227-28).  Jones then barricaded the doors to the east

parts room pursuant to Lee's orders.  (Tr. 228).  Jones also barricaded the doors to the west

parts room at Lee's direction, even though Jones admitted that "all the stuff that was left in

there was stuff that worked on the thermoforming equipment."  (Tr. 229).

### L.  Formall Removes the Equipment From the Marion T Facility

On May 21, 2012, Krohn and a crew from Formall arrived at the Marion T facility to

remove the equipment it had purchased from TME.[17]  (DE 113 Stip. 21).  However, when

Formall arrived, there was no power or water in the facility.[18]  (DE 113 Stip. 21; Tr. 52, 135,

---

[15] Lee claimed that Formall was told that if it believed anything in the parts rooms was Formall's, to let
Marion T know, and that "we'll go in there with you and get it and you can take it."  (Tr. 53).  There is no evidence
besides Lee's testimony, however, to support this claim, and Lee's testimony on this point is less than credible.
Furthermore, there was never any dispute that Formall purchased the parts to the west thermoformer, and Marion T
knew at least some of Formall's parts were inside the parts rooms when it barricaded the doors. (*See* Tr. 97, 102;
Exs. 1, 4).

[16] However, at the trial between TME and Marion T in 2014, Lee was asked whether there were any assets
in the two parts rooms other than what TriEnda had brought to the facility, and Lee responded: "Well, TriEnda
leased it, and TriEnda, I assume, brought the parts there."  (Tr. 138).

[17] Formall had sent a crew a week earlier, but while they were en route, they received a call from Krohn
stating that he had just learned they would not be allowed to enter the building.  (Tr. 326).  The crew then turned
around and went home, returning a week later.  (Tr. 326)

[18] Lee knew that there was no electricity in the TriEnda space at the time, as TriEnda had not paid its
electric bill.  (Tr. 136-37).  Lee had no idea that the water was turned off in the TriEnda space, as that space was
separately metered.  (Tr. 136).

326).  This caused Formall to delay its start of the removal process, as it had to locate, rent, and install generators to power the space.  (Tr. 326-27).  Formall had to bring in water for its crew so that they could manually flush the toilets using buckets of water.  (Tr. 135, 327).  Also, Formall initially did not have access to the building for the extended hours its crew planned to work.  (Tr. 327-28).  Eventually, to gain access, Formall agreed that it would pay Marion T's security personnel for time beyond a 40-hour workweek.  (Tr. 327-28).

Once power was restored in the TriEnda space, Krohn noticed that the area did not look like it did on the multiple trips that Formall had taken to the Marion T facility to inspect the equipment.  (Tr. 328-29).  Rather, spare parts and some of the accessories to the thermoformers had been moved.  (Tr. 328-29).  When Krohn asked Jones where the missing parts and accessories were and why things had been moved, Jones denied that anything had been moved.  (Tr. 329-30).

Eventually, Krohn went looking for the missing parts.  (Tr. 398).  First, he squeezed through the barricade into the east parts room, and he either looked into the west parts room or was able to enter that room as well.  (Tr. 395).  He observed that a significant number of spare parts were missing or had been moved; some parts that had been located in or around the west thermoformer had been moved into the east parts room.  (Tr. 395).  Krohn also went looking in the Marion T side of the building for the missing parts, despite that the building lacked electricity, and despite that he had been instructed not to go in that portion of the building.  (Tr. 298, 398).  Krohn eventually found the skids of missing parts back in a dark room on the Marion T side of the building.  (Tr. 398).  When Krohn confronted Jones with this evidence, Jones admitted to having moved the skids of parts there at Lee's direction.  (Tr. 399).

Eventually, Formall moved the skids barring the doors to the parts rooms and then removed the spare parts.  (DE 113 Stip. 23).  Jones, who was off site at the time, received a call from another security guard informing him that Formall had moved the skids and was removing items from the barricaded rooms.  (Tr. 214, 241-42).  When Jones arrived at the facility, he made Formall put everything back that he thought was not a spare part to a thermoformer.  (DE 113 Stip. 24).  Some items, such as taps and dies, however, were buried in the front of the truck.  (Tr. 229-30).  A supervisor from Formall promised Jones that he would bring these items back once the truck was unloaded.  (Tr. 229-30).  Jones released the truck as soon as Formall removed what it could and had promised to bring back the other items.[19]  (Tr. 230).  Jones confirmed that Formall later returned the taps and dies as promised, even though the taps and dies worked on the thermoformer.[20]  (Tr. 229-30).  Formall took everything that Jones considered to be a spare part to either Brown thermoformer and returned what Jones said was not a spare part.  (Tr. 214).

On May 28, 2012, which was Memorial Day, Jones informed Lee that Formall had removed all the spare parts, that he had stopped Formall from taking other items, and that he had made Formall put the non-parts items back.  (Tr. 242).  According to Lee, Jones called him and told him that Formall had "broke into" the facility; took items out the back door where the loading docks were, rather than the front door that Formall had been using where Jones's checkpoint was located; and loaded the items on semi trucks.  (Tr. 53, 216-17).  Within the

_____

[19] According to Jones, nothing left the facility unless Jones or one of the other two security guards said it was okay.  (Tr. 240).

[20] Although Formall believed it had purchased the taps and dies, Krohn instructed his project manager to cooperate with Jones to keep the peace.  (Tr. 333-34).

week, Lee came to the Marion T facility to inspect what Jones had reported to him; Formall was still working on site at the time. (Tr. 242, 325, 328). Lee never informed Formall that he believed it had taken any items that it was not permitted to take.[21] (Tr. 55, 242).

Formall removed some, but not all, of the bus duct needed to power the west thermoformer that it had purchased.[22] (DE 113 Stip. 25). Marion T refused to allow Formall to take all of the bus duct to the west thermoformer. (DE 113 Stip. 26). Formall estimates that it was not permitted to take approximately 150 feet of 1200 amp bus duct and 400 feet of 800 amp bus duct. (Tr. 475-77; Ex. 5 at 302; Ex. F-1). Given what was left behind, Formall could not operate the thermoformer at full capacity in twin-sheet mode—that is, it could only operate the thermoformer in single-sheet capacity—because Formall did not have sufficient electrical equipment to power the entire machine. (Tr. 361-62). Just to get the thermoformer to operate in single-sheet capacity, Krohn had to reconfigure the bus duct Formall did take to be able to run one of the ovens and power the rest of the machine. (Tr. 489).

Lee testified that Kruschke contacted him during Formall's and Marion T's dispute about the bus duct, and told him that Formall was willing to pay an additional $10,000 for the remaining bus duct to the west thermoformer. (Tr. 53). Lee said that Formall then later

---

[21] Formall was on site at the Marion T facility for nearly a month, working long hours every day to disassemble the huge thermoformer and to gather all the spare parts. (DE 113 Stip. 27). Krohn was at Marion T at the beginning of the process and at the end, and he was in communication with his crew on site. (Tr. 331-32). When Krohn was not at Marion T, he was in Tennessee receiving and examining the equipment and parts that were unloaded from the trucks. (Tr. 331-32). He testified that nothing was received or unloaded that was not thermoforming equipment, parts, or used in the service of a thermoformer. (Tr. 331-32). Lee, too, agreed that everything Formall took could be used in the operation of the thermoformer it had purchased. (Tr. 130, 132).

[22] Despite the parties' stipulation that Marion T refused to allow Formall to remove all of the bus duct, Jones testified that Formall took all of the bus duct to the west thermoformer and that there was no bus duct left at the facility that went to the Brown thermoformer. (Tr. 217-18). Jones testified that he called Lee and asked about the bus duct, and that Lee said Formall was allowed to take it. (Tr. 217). However, on cross examination, when confronted with his earlier deposition testimony, Jones agreed that Formall had not taken everything that was listed on the quote Marion T obtained from Rex Collins Electric, Inc., in August 2012. (Tr. 234-37; Ex. 9).

retracted this offer, which resulted in Lee telling Kruschke to "forget it" and that "[t]he bus duct is not leaving." (Tr. 53). At another point in his testimony, Lee stated that he was asked to sell the remaining bus duct to the west thermoformer for $10,000, but that he "never considered selling it." (Tr. 76).

Krohn agrees that he told Kruschke that Formall would pull out of the deal if it did not get all three lines of bus duct to the west thermoformer. (Tr. 452-53). Krohn denies, however, that he ever made an offer to pay an additional $10,000 for the remaining bus duct, as he adamantly testfied that Formall had purchased *all* of the bus duct to the west thermoformer under the Formall Agreement. (Tr. 452-53)

### M. Marion T Calls the Police

On July 16, 2012, approximately six weeks after Formall had left the Marion T facility, Marion T (through its manager, Lee) contacted the Marion County Police Department and reported that Formall and TME had stolen items that were not theirs to take. (DE 113 Stip. 28). Marion T never contacted Formall, either while Formall was still on site or after it had left, before calling the police. (Tr. 89, 365). Formall only learned there was a problem when the police appeared at its Tennessee facility several months after Formall had finished its removal of the equipment at the Marion T facility. (Tr. 363, 365). When at the Formall site, the police took photographs of what Formall had removed from the Marion T facility. (Tr. 363; Ex. 5 at 207-26).

The investigating officer wrote a case report on the matter after interviewing Lee, Krohn, Kruschke, one of Marion T's security guards, and a representative from TriEnda.[23]

---

[23] Neither the police officer, Kruschke, the security guard, or the TriEnda representative testified at trial.

(Ex. 5).  The report summarizes Lee's allegations that he was missing $200,000 to $300,000 in equipment after Formall left, that Formall had removed the barricades to the parts rooms without permission, and that Formall went into the Marion T side of the facility after being told not to.  (Ex. 5 at 2).  It also summarizes the officer's interview with Krohn, who stated that the Formall Agreement was for all of the electrical equipment "from the main switch gear on" that supplied the thermoformer that Formall was purchasing.  (Ex. 5 at 3-4).  Krohn described how Marion T had moved the parts that Formall had purchased behind barricaded doors and to a hidden, dark corner on the Marion T side of the facility.  (Ex. 5 at 4).

The report also states that the police officer interviewed Kruschke via telephone.  (Ex. 5 at 6).  In that interview, Kruschke stated that "the contract" was simple in that it stated "they would get at least one bus duct."[24]  (Ex. 5 at 6).  He said that while "they" first thought there was just one bus duct to the Brown thermoformer, Krohn informed him that the thermoformer had three lines of bus duct.  (Ex. 5 at 6).  Kruschke said that Krohn told him that Formall needed all three lines or it would pull out of the deal, and that Krohn offered another $10,000 for "the third bus duct."  (Ex. 5 at 6).  Kruschke said that he then called Lee, and Lee agreed to let Formall have "the third bus duct" and that he would tell Jones to let Formall remove the bus duct.  (Ex. 5 at 6).  Kruschke added that he did not know why Lee was making these claims, as he had advised Lee that he would make good money on the bus duct and that TME would pay him if Formall did not.  (Ex. 5 at 6).

Kruschke said that several weeks later, Lee contacted him, asking for "the money."

---

[24] The report does not identify which contract Kruschke is speaking about or who exactly he was referring to.  Presumably, the "they" is Formall, but "the contract" could have been either the Formall Agreement or the Marion T Agreement.

(Ex. 5 at 6). Kruschke responded that Formall had not yet sent him the money, but that if Lee wanted him to, Kruschke would send Lee the money immediately. (Ex. 5 at 6). Lee then got "salty" with Kruschke and said that he would no longer honor the agreement. (Ex. 5 at 6).

Kruschke also told the officer that Krohn had called him to report that Marion T was hiding the spare parts that Formall had purchased. (Ex. 5 at 7). Kruschke then contacted Lee, informing him that he could not hide these parts because TME had sold the parts to Formall. (Ex. 5 at 7). Kruschke told Lee that there was nothing Lee could do with the parts other than scrap them because they were unique to the Brown machines, that Formall had pictures of all of the parts it had purchased, that Krohn had no reason to lie, and that all of the parts Lee was complaining about went to the Brown machine. (Ex. 5 at 7). Kruschke said that Lee then made the parts available to Formall for removal the next day. (Ex. 5 at 7).

### N. The Allegedly Converted Spare Parts and Miscellaneous Items

At trial, Marion T produced an "Inventory List" of the items that were in the two parts rooms that Lee believed Formall converted, together with their estimated value. (Ex. 10; Tr. 110-13). Lee admitted, however, that there was no actual inventory maintained concerning the two rooms. (Tr. 110-13). The "Inventory List" for the east parts room includes: five temperature control units ($13,000); skid of brass fittings ($5,000); skid of stainless steel fittings ($5,000); skid of brass and stainless steel fittings ($5,000); four to 10 skids of parts for the east thermoformer ($102,000); and other miscellaneous parts, including nuts, bolts, and fittings ($10,000). (Ex. 10). The "Inventory List" for the west spare parts rooms reflects: a wooden Lazy Susan ($10,000); four Lawson cabinets ($20,000); eight cabinets with bins ($15,000); a roll-around ladder ($5,000); an air conditioner tool bench ($10,000); three

lockable cabinets ($50,000); and other miscellaneous parts, including nuts, bolts, and fittings ($12,000). (Ex. 10). Lee testified that the values he assigned to these parts were his "best guess" of what the parts might have cost. (Tr. 110-13).

Marion T's list of the property that Formall allegedly converted and such property's value, however, has dramatically reduced since the trial. In its proposed findings of fact and conclusions of law submitted after the trial, Marion T seeks just $20,000 in total for the allegedly converted spare parts. (DE 124 at 10). This is comprised of "a skid of stainless steel, a skid of brass, and a skid of copper fittings" that had a "value of $5,000 each"; and "the ladder, Lazy Susan, equipment, and other parts removed by Formall" with "a combined value of $5,000." (DE 124 at 10). The three skids of fittings are the parts that Marion T claims it salvaged from the Thompson/RCA operations that Formall removed from the east parts room (Tr. 46-47, 142-43, 219, 248-49), and the other miscellaneous items were removed by Formall from the west parts room (Tr. 47-49).

### O. The Allegedly Converted Bus Duct

Marion T contends that Formall converted bus duct to the west thermoformer when it removed a portion of the bus duct. (Tr. 412-13). Conversely, Formall claims that Marion T converted a portion of the bus duct when it refused to allow Formall to remove all of the bus duct to the west thermoformer. (DE 113 Stip. 26; Tr. 416).

#### 1. Gibbons's Testimony About the Bus Duct and Power Supply

Marion T called as a witness Joseph Gibbons ("Gibbons"), a project engineer/project manager for Rex Collins Electric, Inc., an industrial and commercial electrical contractor. (Tr. 159-60, 181). Gibbons has a bachelor's degree in electrical engineering technology. (Tr. 180).

In 2007, Gibbons designed for TriEnda the installation of the electrical equipment to connect the thermoformers to the electrical supply in the Marion T building. (Tr. 159-60, 165, 180). Gibbons also prepared a quote for Marion T in August 2012 to provide and install the bus duct, tap boxes, and power panels that were removed by Formall. (Tr. 64; Ex. 9). The work proposed by the August 2012, however, was never performed. (Tr. 65).

The August 2012 proposal, which was priced at $201,380, included the provision and installation of "feeder duct," which is also referred to as bus duct; "cable tap boxes"; and "switchboard." (Tr. 173; Ex. 9). Specifically, the quote called for installation of at least 260 feet of 3000 amp bus duct, at least 150 feet of 1200 amp bus duct, two 3000 amp cable tap boxes, two 1200 amp cable tax boxes, one 3000 amp switchboard (for the "end" of the 3000 amp bus duct), and one 1200 amp switchboard (for the "end" of the 1200 amp bus duct). (Tr. 173; Ex. 9; Ex. A at 107, 108). No "powerhouses" or "transformers" were included in the proposal. (Tr. 173; Ex. 9).

Gibbons was asked to explain how a thermoformer—specifically, the west thermoformer—received power. (Tr. 166; Ct. Ex. 1[25]). Gibbons testified as follows: A tremendous amount of power, 38,000 volts, traveled into the Marion T facility from a large substation, which was owned by the utility, located outside on the south end of the facility; the power was too high in voltage. (Tr. 166, 170, 184, 185-86; Ct. Ex. 1). From the utility substation located outside the facility, the power went to a main substation, which was owned by Marion T and located inside the building. (Tr. 166, 184; Ct. Ex. 1). The main substation then stepped down the power, which was too high in voltage, to 12,470 volts. (Tr. 166, 184;

---

[25] The Court asked Gibbons to draw a diagram to illustrate how the power flowed into the Marion T building and traveled to the west transformer, and that drawing is the Court's Exhibit 1. (Tr. 182-83; Ct. Ex. 1).

Ct. Ex. 1).  From there, the power traveled throughout the facility to various "powerhouses" in the facility, one of which was called the "penthouse."  (Tr. 166-67, 184; Ct. Ex. 1).  In the penthouse, the power went through a "transformer," which stepped it down to a useable 480 volts.  (Tr. 166-67, 184; Ct. Ex. 1).  From the transformer, the power traveled to a "switchboard," which was located upstairs in the penthouse.  (Tr. 167, 184; Ct. Ex. 1).  From the penthouse, the power went to the building's "distribution gear" or "switch gear," which contained circuit protection and could turn something on and off.  (Tr. 168, 184-85; Ct. Ex. 1).

From the switch gear, power went through large copper wire conductors to a "tap box" that was directly connected to a "feeder duct."  (Tr. 168-69; Ct. Ex. 1).  Feeder duct, also referred to as bus duct, consists of "substantial sized copper bus bars," which come in 10-foot sections and are quite valuable.  (Tr. 161, 168-69, 193).  The power then ran from the first tap box through the bus duct to the second tap box, and down through conduit via wire to connect to a "switchboard"—also commonly referred to as a "power panel"—on the machine.[26]  (Tr. 163, 168-70, 173, 175, 181, 184; Ct. Ex. 1).  This power panel, then, was the "control center for the machine."  (Tr. 170; *see* Ex. A at 107).

When asked what he considered to be the "first electrical disconnect from the building," Gibbons identified the large substation located outside of the facility.  (Tr. 172-73).  When asked to identify the "first point of disconnect" or "first electrical disconnect" from the machine, Gibbons responded, "the switch that feeds the machine," that is, the "switchboard."  (Tr. 174-75, 198 (stating that "from the machine back," the "first junction box" would be the

---

[26] Upon further questioning, Gibbons agreed that the switchboard could also be called a "switch gear."  (Tr. 195).  He also said that the terms "switch gear" and "power panel" are used interchangeably by many people.  (Tr. 196).

tap box above the switchboard)).  Gibbons explained that power flows "downstream" from the utility substation to the thermoformer, and that referring to power from the machine to the substation would be "upstream."  (Tr. 200).

Gibbons was also asked what equipment would be encompassed in the "[w]iring from switch gear to machine to include bus bar from switch gear to power panel."  (Tr. 177-78). Gibbons responded that the only bus duct that existed ran from the switch gear "upstairs" in the penthouse to the "power panel which is located out at the machine."  (Tr. 178, 199-200). Gibbons testified that there was no bus duct between the power panel and the thermoformer, only wiring.  (Tr. 178, 199-200).

Gibbons testified that there were two lines of bus duct, a 3000 amp run and a 1200 amp run, feeding the west thermoformer, and that the 3000 amp line, by itself, would not operate the machine.  (Tr. 193, 196).  Gibbons admitted, however, that he did not remember the exact machine and that he was relying on "what was quoted to the machine."  (Tr. 196).

The Court finds that Gibbons generally was a knowledgeable witness about the power supply to the west thermoformer.  However, he seemed to rely on his 2012 written quote, rather than his own recall of the power supply's configuration, which resulted in him qualifying his testimony to some extent.[27]  Ultimately, Gibbons's description of the power supply to the west thermoformer was helpful, but not entirely accurate, as he testified that the west thermoformer was powered by just two lines of bus duct.  The parties, however, do not

---

[27] *See, e.g.*, Tr. 161 ("I could not remember if that was included, yes."), 162 ("I can't remember specifically on that feeder duct."), 162-63 ("I can't remember that machine specifically, but yes."), 184 ("And if I remember right . . . ."), 185 ("I can't remember how the 1200-amp feed figured in."), 186 ("I don't remember the break out of what each panel fed."), 187 ("I don't remember exactly . . . but I do remember 1 machine in that corner."), 193 ("[J]ust looking at what I proposed from what I remember, there were 2 power panels . . . ."), 196 ("I don't remember the exact machine, but that was what was quoted to the machine.").

dispute that the west thermoformer was actually powered by three lines of bus duct.

2. Krohn's Testimony About the Bus Duct and Power Supply

Krohn, too, testified about how the west thermoformer received power in the Marion T facility.[28]  Krohn explained that from the facility's main switch gear, three lines of bus duct ran to three power panels that were located six to eight feet from the west thermoformer.  (Tr. 340-41, 406; Ex. F-1[29]).  These lines consisted of:  (1) one line of 3000 amp bus duct that ran to a 3000 amp power panel; (2) one line of 1200 amp bus duct that ran to a 1200 amp power panel; and (3) two parallel runs of 800 amp bus duct that connected to a 1200 amp bus duct that ran to a 1200 amp power panel.  (Tr. 341-43, 466; Ex. F-1).  These three lines of bus duct were due to the thermoformer's extraordinary power requirements; the lines powered different aspects of the machine, and all three lines were required for the machine to operate in its full capacity, that is, in twin-sheet mode.  (Tr. 341, 343, 489-90).

Ultimately, Formall removed all of the 3000 amp bus duct, several short runs of the 1200 amp bus duct, the 3000 amp power panel, and the two 1200 amp power panels.  (Tr. 412, 453-54, 473-77).  Formall did not, however, remove the 400 feet of 800 amp bus duct or 150 feet of 1200 amp bus duct.  (Tr. 352, 386-87, 415-16, 473-77).  Marion T—in particular, Jones—refused to allow Formall to remove that portion of the bus duct.  (DE 113 Stip. 26; Tr. 416).

───────────

[28] The Court finds that Krohn, too, was very knowledgeable about the power supply to the west thermoformer.  In contrast to Gibbons, Krohn was able to recall specific details of the configuration of the power supply, explained what bus duct Formall had removed, and correctly described the three lines of bus duct powering the west thermoformer.  Accordingly, the Court finds that Krohn was a very credible witness about the bus duct and power supply to the west thermoformer.

[29] Krohn drew two diagrams to illustrate how the power flowed into the Marion T building and traveled to the west transformer, and those drawings are the Court's Exhibits F and F-1.  (Tr. 275-76; Ct. Exs. F, F-1).

25

Formall obtained quotes from two vendors, Graybar Electric Company, Inc., and Grainger, Inc., concerning the value of the bus duct that Formall believed it had purchased but that Marion T refused to let Formall remove. (Tr. 351-53; Exs. B, C). These estimates, which were for new bus duct, uninstalled, were $129,511.72 and $132,200, respectively. (Exs. B, C).

## II. CONCLUSIONS OF LAW

In its ruling on Formall's motion for summary judgment, the Court identified the following items of disputed ownership that remained for trial: (1) whether Formall's purchase of "ALL Brown spare parts" in the Formall Agreement entitled Formall to all of the spare parts to both thermoformers, or just all of the spare parts to the west thermoformer that Formall purchased; (2) whether Formall's purchase of "ALL Brown spare parts" in the Formall Agreement included certain items used in maintaining or servicing the thermoformer, including a Lazy Susan, Lawson cabinets, cabinets with bins, lockable cabinets, a roll-around ladder, and an air conditioner tool bench (the "miscellaneous items"); and (3) whether Formall or Marion T owned the bus duct that was removed or retained by the other. (DE 88 at 25). The Court will begin its consideration of these disputes by reviewing the standards under Indiana law pertaining to a claim of conversion and interpretation of a contract.[30]

### A. The Claim of Conversion

Each party claims that the other converted its property in violation of Indiana law. "The elements necessary to establish a civil cause of action for conversion are similar to those

___

[30] Formall cites the Indiana rules of contract construction in its proposed findings of fact and conclusions of law, and Marion T does not oppose Formall's doing so. The TriEnda Lease and the Marion T Agreement are silent as to governing law, but the Formall Agreement states it is to be interpreted in accordance with Ohio law. (Ex. 1 at 2). As the Court determined in its ruling on Formall's motion for summary judgment, the Ohio rules of contract construction are similar to Indiana's rules, *see Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762-65 (6th Cir. 2008); *Mulch Mfg., Inc. v. Advanced Polymer Sols., LLC*, 947 F. Supp. 2d 841, 857-58 (S.D. Ohio 2013), and thus the Court will cite to Indiana law in this Opinion and Order.

in the criminal conversion statute and, like all civil claims, must be proven by a preponderance of the evidence." *Meridian Fin. Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1058 (S.D. Ind. 2011) (citing *McKeighen v. Daviess Cty. Fair Bd.*, 918 N.E.2d 717, 723 (Ind. Ct. App. 2009)); *see also Anderson v. Indianapolis, Ind. AAMCO Dealers Advert. Pool*, 678 N.E.2d 832, 838 (Ind. Ct. App. 1997) ("The elements necessary to establish a civil cause of action for conversion are found in the criminal conversion statute." (citation omitted)).

"To prove conversion, a plaintiff must demonstrate that the defendant 'exert[ed] unauthorized control over property of another[.]'" *Meridian Fin. Advisors, Ltd.*, 763 F. Supp. 2d at 1058 (alterations in original) (quoting Ind. Code § 35-43-4-3). Stated another way, the tort of conversion "consists either in the appropriation of the personal property of another to the party's own use and benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or in withholding it from his possession, under a claim and title inconsistent with the owner's." *Nat'l Ass'n of Sys. Adm'rs, Inc. v. Avionics Sols., Inc.*, No. 1:06-cv-159-SEB-JMS, 2008 WL 140773, at *14 (S.D. Ind. Jan. 10, 2008) (quoting *Computs. Unlimited, Inc. v. Midwest Data Sys., Inc.*, 657 N.E.2d 165, 171 (Ind. Ct. App. 1995)). "Mens rea . . . is not an element of tortious conversion." *Computs. Unlimited, Inc.*, 657 N.E.2d at 171 (citation omitted); *see also MNW, LLC v. Mega Auto Grp., Inc.*, 884 F. Supp. 2d 740, 765 (N.D. Ind. 2012). "Good faith is no defense." *Computs. Unlimited, Inc.*, 657 N.E.2d at 171 (citation omitted).

Enhanced civil damages are available for victims of criminal conversion. Ind. Code § 34-24-3-1. "In any criminal conversion action, criminal intent is an essential element that must be proven." *JET Credit Union v. Loudermilk*, 879 N.E.2d 594, 597 (Ind. Ct. App. 2008)

(citation omitted); *see Meridian Fin. Advisors, Ltd.*, 763 F. Supp. 2d at 1058 ("Unlike with criminal conversion, mens rea is not an element of tortious conversion." (citing *Nat'l Ass'n of Sys. Adm'rs, Inc.*, 2008 WL 140773, at *14)). "To establish this element of the crime of conversion, a plaintiff must show that the defendant was aware of a high probability his control over the plaintiff's property was unauthorized." *JET Credit Union*, 879 N.E.2d at 597 (citation omitted).

## B.  Interpreting the Lease and Agreements

In assessing whether either party converted the other's property, the Court must interpret the terms of the TriEnda Lease, the Formall Agreement, and the Marion T Agreement to determine who was the rightful owner of the disputed equipment. "[T]he goal of contract interpretation is to ascertain the parties' intent." *BKCAP, LLC v. CAPTEC Franchise Tr. 2000-1*, 572 F.3d 353, 359 (7th Cir. 2009) (citations omitted); *see also Nikish Software Corp. v. Manatron, Inc.*, 801 F. Supp. 2d 791, 800 (S.D. Ind. 2011); *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, 867 N.E.2d 203, 212-13 (Ind. Ct. App. 2007). "In the case of a written contract, the parties' intent is determined by looking first to the plain and ordinary meaning of the contract language." *BKCAP, LLC*, 572 F.3d at 359 (citations omitted); *see also USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997).

"If the contract language is clear and unambiguous, the document is interpreted as a matter of law without looking to extrinsic evidence." *BKCAP, LLC*, 572 F.3d at 359 (citations omitted). "The Court must read the contract as a whole, construing language to give meaning to all of the contract's words, terms, and phrases." *BMD Contractors, Inc. v. Fid. & Deposit Co. of Md.*, 828 F. Supp. 2d 978, 984 (S.D. Ind. 2011) (citing *Trustcorp Mortg. Co.*, 867

N.E.2d at 213).  "If, however, the contract language is ambiguous, an examination of relevant extrinsic evidence is appropriate in order to ascertain the parties' intent."  *BKCAP, LLC*, 572 F.3d at 359 (citations omitted).

### C. Formall Did Not Exercise Unauthorized Control
### Over the Spare Parts to the East Thermoformer

First, Marion T acknowledges that Formall was entitled to remove the spare parts to the west thermoformer, but claims that Formall converted the spare parts to the east thermoformer when Formall took all of the spare parts to both Brown thermoformers.  Formall disagrees, arguing that under the Formall Agreement it purchased all of the spare parts to both Brown thermoformers.

Formall acquired its rights to the spare parts through the Formall Agreement, which it entered into with TME on March 23, 2012.  (*See* DE 113 Stip. 8; Ex. 1).  Under the Formall Agreement, Formall purchased, among other things, the west thermoformer and "ALL Brown spare parts."  (DE 113 Stip. 8; Ex. 1).  Formall paid for the equipment in full as of May 14, 2012.  (DE 113 Stips. 13, 14).

On May 18, 2012, about two months after entering into the Formall Agreement with Formall, TME entered into the Marion T Agreement with Marion T.  (DE 113 Stip. 20; Ex. 4). The Marion T Agreement gave TME the right to remove and sell the "spare parts currently in the building for the west Thermoformer only," with the right, title, and ownership of any remaining spare parts becoming the property of Marion T.[31]  (DE 113 Stip. 3; Ex. 4 at 2-3).

In its ruling on Formall's summary judgment motion, the Court concluded that the

---

[31] The Court has already concluded in its ruling on Formall's summary judgment motion that any rights Marion T had to the disputed spare parts or miscellaneous items arose on May 21, 2012, through entering into the Marion T Agreement.  (DE 88 at 15).

meaning of the term "ALL Brown spare parts" as used in the Formall Agreement was ambiguous. (DE 88 at 20-21). The Court explained that the term could mean all of the spare parts to either Brown thermoformer in the Marion T facility, or alternatively, it could mean all of the spare parts to the Brown thermoformer that Formall was purchasing, that is, the west thermoformer. (DE 88 at 29-21). As such, the Court needed to examine relevant extrinsic evidence to determine the intent of Formall and TME when entering into the Formall Agreement. *See BKCAP, LLC*, 572 F.3d at 359.

Krohn testified that the two Brown thermoformers were identical, and that only three such thermoformers of that size existed in the world, making their parts interchangeable. (Tr. 367). Krohn has 20 years of experience in the thermoforming industry, he spoke with detailed knowledge about thermoformers, his testimony was consistent throughout the trial, and his ability to recall details of specific events was noted throughout the entire trial, making him a very credible witness. (Tr. 260-61).

Lee testified that while two thermoformers were similar, they were of different designs and configurations, making their spare parts unique to each thermoformer. (Tr. 31, 130-33). He claimed that the spare parts to the west thermoformer were stored in the west parts room, and the spare parts to the east thermoformer were stored in the east parts room. (Tr. 13-31). As he sees it, then, Formall was not entitled to remove any items from the east parts room.

Lee admitted, however, that he has only a "basic knowledge" of thermoformers as a "lay person" and "doesn't understand it all." (Tr. 125). Lee also conceded that he was unaware of any item that was in either spare parts room that would not work on the west thermoformer. (Tr. 132). And while Lee asserted at trial that there were differences between

the two thermoformers, he testified at his deposition in 2013 that he did not know whether the two thermoformers were identical or not. (Tr. 125-26). Moreover, as concluded earlier, Lee was a less credible witness than Krohn, as Lee at times contradicted himself or Jones and often had only a vague recollection of events or stated that he could not recall the events. *See* footnote 4 *supra*.

The evidence at trial failed to reveal any distinction between spare parts to the west Brown thermoformer and spare parts to the east Brown thermoformer. Nor did the evidence support Lee's assertion that the spare parts to the west thermoformer were stored in the west parts room and the spare parts to the east thermoformer were stored in the east parts room. Rather, the evidence consistently revealed that the west parts room was more of a maintenance shop that serviced both Brown thermoformers, while the east parts room was a storage area for existing or obsolete parts to the thermoformers. (Tr. 45, 47, 59, 61, 93, 130-31, 133, 225-26, 228-29; *see also* DE 124 at 4). This evidence shows that the spare parts were interchangeable between the two machines, and that the spare parts to the two Brown thermoformers were not stocked or stored separately. In fact, based on this evidence, it would be impossible to even identify the spare parts to the west thermoformer from the spare parts to the east thermoformer. (*See also* Ex. 5 at 7). This is all strong evidence that the term "ALL Brown spare parts" was intended to include all of the spare parts to both thermoformers.

Also, Krohn credibly testified that obtaining the entire spare parts inventory was a key incentive for Formall to enter into the Formall Agreement. (Tr. 295). Formall runs its manufacturing processes 24 hours a day, either five or seven days a week, and Krohn explained that thermoformers have thousands of parts that are constantly being repaired or

needing preventative maintenance, making it a constant struggle to keep the machines operating 24 hours a day. (Tr. 295-97). Having a good spare parts program helps to keep the machines running in order to meet customer demands and production schedules. (Tr. 296-97). Krohn said that if Formall had purchased the west thermoformer without the spare parts program, it would have paid much less for the thermoformer because creating its own spare parts program would have added significant expense. (Tr. 297). Krohn also considered as a valuable feature of the transaction that TriEnda's spare parts were well ordered in Akro bins, Lawson cabinets, and other cabinets. (Tr. 298-99).

Moreover, four days after TME entered the Formall Agreement to sell the west thermoformer and spare parts to Formall, TME contracted with Vantage Plastics to sell the east thermoformer. (DE 113 Stip. 10). Vantage Plastics did not acquire any spare parts through the Vantage Plastics Agreement. (Ex. 2). Most likely, this is because TME had already sold all of the spare parts to Formall under the Formall Agreement four days earlier. (Ex. 2). Thus, that TME did not convey any spare parts to Vantage Plastics is further evidence that the term "ALL Brown spare parts" in the Formall Agreement meant all of the spare parts to both thermoformers.

Of course, the record is not perfectly clear. Two months after entering into the Formall Agreement, TME entered into the Marion T Agreement, which allowed TME to remove the "spare parts currently in the building for the west Thermoformer only," with the right, title, and ownership of any remaining equipment becoming the property of Marion T. (DE 113 Stip. 3; Ex. 4 at 2). It is difficult to square the terms of the Marion T Agreement with the terms of the Formall Agreement, and there was no testimony at trial from Kruschke, who negotiated both

agreements on TME's behalf. Ultimately, however, the Court concludes that the intent of the parties to the Formall Agreement, which was first in time, was to convey all of the spare parts to both thermoformers to Formall. As such, that TME may later have attempted to convey some of these same spare parts to Marion T, whether mistakenly or otherwise, is not determinative because by that time TME no longer had title to these spare parts. (Ex. 5 at 7); *see* Ind. Code § 26-1-2-403(a) (providing that under Indiana law, a purchaser of goods acquires all title to which the purchaser's transferor had power to transfer).

In any event, in its proposed findings of fact and conclusions of law Marion T seems to have abandoned its claim that Formall converted the spare parts to the east thermoformer. (*See* DE 124). Rather, Marion T's conversion claim in its proposed findings of fact and conclusions of law centers on the miscellaneous items, certain items from the east parts room, and the bus duct that Formall removed.

For all of these reasons, the Court concludes that Formall's purchase of "ALL Brown spare parts" in the Formall Agreement entitled Formall to remove from the Marion T facility all of the spare parts to both Brown thermoformers, and thus, Formall did not "exercise unauthorized control over property of another" when it took these parts. *MNW, LLC*, 884 F. Supp. 2d at 765. Because Marion T has not establish a required element of tortious and criminal conversion, Marion T's conversion claims based on Formall's removal of spare parts to the east thermoformer fail.

### D. Formall Did Not Exercise Unauthorized Control Over the Miscellaneous Items

Next, Marion T contends that under the Marion T Agreement it acquired title to certain miscellaneous items that were located with the spare parts to the thermoformers, but that were

more generic in nature and used for storing the spare parts or servicing the thermoformers. (DE 124 at 10). These items include the Lawson cabinets, cabinets with bins, lockable cabinets, a roll-around ladder, an air conditioner tool bench, and purportedly, a Lazy Susan wooden bin. (DE 124 at 10). Marion T contends that Formall converted these miscellaneous items when it removed them from the facility. Formall disagrees, contending that these miscellaneous items fall within the scope of the term "ALL Brown spare parts" in the Formall Agreement.

As already explained, in ruling on Formall's summary judgment motion the Court concluded that the term "ALL Brown spare parts" as used in the Formall Agreement is ambiguous, and that relevant extrinsic evidence needed to be examined to determine the intent of Formall and TME when entering into the Formall Agreement. (DE 88 at 23-24). The evidence at trial revealed that TriEnda had placed the miscellaneous items in the Marion T facility to support the operation of the Brown thermoformers, but the items were not unique to the machines. (Tr. 112, 130-33, 138). Krohn considered Formall's ability to purchase the miscellaneous items to be a valuable feature of the Formall Agreement because the miscellaneous items served to store and maintain the spare parts program in good order. (Tr. 298-99).

Moreover, Jones testified that he made Formall put everything back, or bring everything back, that was not a spare part to a thermoformer. (DE 113 Stip. 24; Tr. 214-15, 241-42). Lee, too, conceded that all of the miscellaneous items could be used in servicing the Brown thermoformers. (Tr. 130-32). And while Lee claimed at trial that the miscellaneous items were worth in excess of $100,000 (Ex. 10; Tr. 110-13), Marion T now indicates in its

proposed findings of fact and conclusions of law that the miscellaneous items are worth just $5,000 in the aggregate (DE 124 at 10).

Based on the evidence presented, the Court concludes that TME and Formall did not intend to parse these few miscellaneous items, which were used to store the spare parts or to service the thermoformers, from Formall's purchase of "ALL Brown spare parts" in the Formall Agreement. *See Quality Oil, Inc. v. Kelley Partners, Inc.*, 657 F.3d 609, 613 (7th Cir. 2011) (stating that under Indiana law, a court must read a contract "as a whole and harmoniz[e] all of its provisions"); *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind. Ct. App. 2007) ("The contract is to be read as a whole when trying to ascertain the parties' intent, and we will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless." (citation omitted)). As such, the Court concludes that the term "ALL Brown spare parts" in the Formall Agreement included the miscellaneous items—that is, the Lawson cabinets, cabinets with bins, lockable cabinets, a roll-around ladder, an air conditioner tool bench, and Lazy Susan wooden bin.

Therefore, Formall was entitled to remove the miscellaneous items from the Marion T facility, and thus, Formall did not "exercise unauthorized control over property of another" when removing these miscellaneous items. *MNW, LLC*, 884 F. Supp. 2d at 765. Accordingly, Marion T's claims of civil and criminal conversion based on Formall's removal of the miscellaneous items also fail.

### E.  Formall Did Not Exercise Unauthorized Control Over the Three Skids of Allegedly Salvaged Parts

Marion T contends that when removing the equipment, Formall wrongfully took three skids of brass, copper, and stainless steel parts that Marion T had allegedly salvaged from the

Thompson/RCA operations. Lee and Jones testified that these skids had been stored in the east parts room during Formall's visits, but that Marion T moved them to the Thompson/RCA side of the facility before Formall came to remove the equipment. (Tr. 219, 227, 248-50). Formall argues that its purchase of "ALL Brown spare parts" included these skids of purportedly salvaged parts, emphasizing that Formall was allowed to inspect the parts and take pictures of them during their visits, that it was Formall's intent to purchase these parts, that Marion T never said these parts were not for sale, and that Marion T allowed Formall to remove the parts from the facility. (Tr. 226, 252).

Although Lee and Jones testified that these skids of metal parts were salvaged from Thompson/RCA, Lee concedes that he instructed Jones to show Formall everything in the TriEnda portion of the facility during their visits. (Tr. 204, 225-26). Neither Lee, nor Jones, informed Formall that any items in that space were not TriEnda's property or not for sale. (Tr. 207-08, 226).

When Lee viewed the photos that Formall had taken of the east parts room during its visits, Lee could not identify any of the alleged $15,000 worth of salvaged metals on skids. (Tr. 155-58; Ex. A at 175). Jones, on the other hand, did claim to identify the allegedly salvaged parts when presented with photos of the east parts room. (Tr. 249; Ex. A at 180). However, Jones did not have personal knowledge that the parts were from Thompson/RCA and could not identify to which equipment they pertained; rather, Jones stated that his crew, who were past Thompson/RCA employees, had told him they were Thompson/RCA parts. (Tr. 249-50). And at his deposition in 2014, Jones testified that there were *no* parts or equipment left over from Thompson/RCA and the building was "[p]retty much vacant," undermining his

trial testimony that these skids were left over parts from Thompson-RCA. (Tr. 204, 250-52).

Furthermore, Jones let Formall remove these skids of parts from the facility, and Jones testified

that nothing was removed from the facility that was not a spare part to a thermoformer. (DE

113 Stip. 24; Tr. 214, 240, 242).

Also, Jones testified that when he and his crew were performing salvage and demolition

in the Marion T facility, they would save the salvaged parts "off to one side." (Tr. 219). It

defies common sense that Marion T would store its salvaged parts in the TriEnda leased space,

as Marion T contends (Tr. 99-100, 137), when Marion T had 800,000 square feet of its own

space at its disposal. Furthermore, at the trial between TME and Marion T in 2014, Lee was

asked whether there were any assets in the two parts rooms other than what TriEnda had

brought to the facility, and Lee responded: "Well, TriEnda leased it, and TriEnda, I assume,

brought the parts there." (Tr. 138). Also, Krohn credibly testified that the purportedly

salvaged parts shown in the photos of the east parts room were used in thermoforming

operations, explaining in detail how the parts were used. (Tr. 318-23, 423-24; *see also* Ex. 5 at

7).

The Court concluded in its ruling on Formall's motion for summary judgment that "the

Formall Agreement included the generic nuts, bolts, and fittings located in the west spare parts

room, and if it is ultimately determined that Formall purchased the [e]ast [s]pare [p]arts, the

generic nuts, bolts, and fittings in the east spare room." (DE 88 at 25). Nothing presented at

trial causes the Court to reconsider this conclusion in its ruling on Formall's summary

judgment motion.[32] Accordingly, the Court finds that the three skids of brass, copper, and

---

[32] Formall also argues that even if TME did not convey title to these items under the Formall Agreement,
Marion T is equitably estopped to assert its ownership of these items now because Marion T allowed Formall to

stainless steel fittings from the east parts room fall within the scope of the term "ALL Brown spare parts" in the Formall Agreement. As such, Formall did not "exercise unauthorized control over property of another" when removing these allegedly salvaged parts, *MNW, LLC*, 884 F. Supp. 2d at 765, dooming Marion T's claim that Formall tortiously or criminally converted these parts.

### F. Marion T Exercised Unauthorized Control Over the Remaining Bus Duct to the West Thermoformer

Marion T contends that it obtained title to all of the bus duct to both thermoformers from TriEnda under the TriEnda Lease, and that Formall committed conversion when it removed a portion of the bus duct to the west thermoformer. Formall, however, argues that Marion T only acquired title to the bus duct to the east thermoformer from TME under the Marion T Agreement, which occurred subsequent to Formall's purchase of the bus duct to the west thermoformer under the Formall Agreement. As such, Formal claims that Marion T converted Formall's property when it refused to allow Formall to remove all of the bus duct to the west thermoformer. (Tr. 347-49, 354-55).

1. Any Title That Marion T Acquired to the Bus Duct Arose From the Marion T Agreement, Not the TriEnda Lease

The TriEnda Lease provides that TriEnda retained ownership of its "manufacturing equipment and electrical wiring back to the first junction box or electrical service feed." (Ex. 6 at 5). Marion T asserts that this language means that TriEnda retained only the wiring to the

---

remove them from the facility. (DE 125 at 43-44; Tr. 248-50); *see Money Store Inv. Corp. v. Summers*, 849 N.E.2d 544, 547 (Ind. 2006) ("The party claiming equitable estoppel must show its (1) lack of knowledge and of the means of knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially." (citation and internal quotation marks omitted)). Marion T does not respond to Formall's equitable estoppel argument in its post-trial briefing. (*See* DE 124).

first junction box or electrical service feed *as measured out from the thermoformer*, which was about six to eight feet out from the machine, and thus, that under the TriEnda Lease all of the bus duct installed by TriEnda became Marion T's property immediately upon installation. (Tr. 30-31).

Marion T's proffered interpretation of the TriEnda Lease defies logic for several reasons. First, Lee testified that TriEnda's cost of installing the bus duct to the west thermoformer was $203,000. (Tr. 67-68, 76-77). As Lee's theory goes then, because there were two thermoformers in the facility requiring bus duct, TriEnda transferred property valued in excess of $400,000 to Marion T immediately upon installation of the bus duct. Lee attempts to rationalize such a transfer by stating that TriEnda's installation of the bus duct, as well as TriEnda's plan to remodel the building and raise the height of the building in some places to 10 or 12 feet, were negotiated terms of the TriEnda Lease. (Tr. 27, 30-31, 67-68). Lee claims that these terms were offered in exchange for Marion T giving TriEnda six months free rent and setting the rent at $1 to $1.50 per square foot below the market rate. (Tr. 27, 30-31, 67-68).

But if Lee is to be believed, one would expect that the TriEnda Lease would have spelled out such a large transfer of value in much more detail. Marion T does not point to any contemporaneous evidence to support its proffered interpretation, and it is undisputed that TriEnda never raised the height of the building. (Tr. 239). Furthermore, at the time the parties entered into the TriEnda Lease, the only "electrical service feed" that existed in the facility was the main switch gear in the penthouse, as TriEnda had to install all of the bus duct and power panels to the west thermoformer after it leased the space. (Tr. 67-69, 160). It seems illogical that the parties would base language in the TriEnda Lease on equipment that did not even exist

39

at the time.

Nor does Marion T's proffered interpretation of the TriEnda Lease square with the terms of the Marion T Agreement. Marion T entered into the Marion T Agreement to receive compensation for unpaid back rent owed by TriEnda. (Ex. 4 at 2-3). So if Marion T already owned all of the bus duct as it claims, why would it negotiate a term in the Marion T Agreement that permits TME to remove the bus duct to the west thermoformer and states that the bus duct to the east thermoformer becomes the property of Marion T? As this Court stated in its ruling on Formall's motion for summary judgment, "[it] defies, logic . . . that Marion T would have entered into an agreement to obtain title to assets *that it already owned*." (DE 88 at 15); *see 3600 Mich. Co., Ltd. v. Infra-Metals, Co.*, No. 2:07-CV-367-PPS-APR, 2011 WL 1402779, at *6 (N.D. Ind. Apr. 13, 2011) ("[C]ourts interpret contracts to avoid absurd results.").

Furthermore, the Marion T Agreement permits TME to remove "[o]nly one bus ducting from the west Thermoformer to Transformer or switch gear" and states that such equipment "shall be removed . . . at the first electrical disconnect." (DE 113 Stip. 30). According to Marion T and Gibbons, the "first electrical disconnect" is the first electrical panel as measured out from the thermoformer. (Tr. 174). But that interpretation makes the Marion T Agreement nonsensical, as Gibbons testified that there is *no* bus duct between the thermoformer and the power panel. (Tr. 185; *see also* Tr. 438-39 (Krohn's testimony stating: "Between the 5 and 10 feet from this power panel to the machine, no, there was not busbar connecting it. It was wiring.")). The Court "should make every effort to avoid an interpretation that renders any words, phrases, or terms ineffective or meaningless." *Bowman v. Int'l Bus. Machs. Corp.*, 853

F. Supp. 2d 766, 769 (S.D. Ind. 2012) (citing *Ind. Gaming Co., L.P. v. Blevins*, 724 N.E.2d 274, 278 (Ind. Ct. App. 2000)).

The more logical reading of the TriEnda Lease, rather, is Formall's proffered interpretation that the "electrical wiring back to the first junction box or electrical service feed" (Ex. 6 at 5) means the wiring to the first junction box or electrical service feed *as measured out from the facility's power source.* Gibbons testified that the power supply comes in from the power feed. (Tr. 200 ("Electron flow is downstream.")). Specifically, Gibbons stated: "Supply came into the building in a large substation outside on the south end of the facility," and the first point of connection was in the "penthouse" in the facility. (Tr. 170-71, 202). Krohn, too, testified that there is usually a transformer on the outside of the wall and a switch gear on the inside of the wall, which typically constitutes the electrical service feed for the facility. (Tr. 359-60).

Formall's interpretation of the TriEnda Lease is also more consistent with the Marion T Agreement, which provides that TME could remove "[o]nly one bus ducting from the west Thermoformer to Transformer or switch gear" and that such equipment "be removed . . . at the first electrical disconnect." (DE 113 Stip. 30). If the "first electrical disconnect" is measured out from the thermoformer, as Marion T urges, there is no bus duct, rendering this provision in the Marion T Agreement meaningless. *See Bowman*, 853 F. Supp. 2d at 769. However, if the "first electrical disconnect" is measured out from the power source, as Formall urges, then bus duct exists, making logical sense of the Marion T Agreement. *Id.*; *see Pittman v. Max H. Smith Farms, Inc*., 506 N.E.2d 1139, 1141 n.2 (Ind. Ct. App. 1987) ("[The] court will use common sense, justice and the probable intention of the parties to construe a contract[.]" (citation

41

omitted)).

For all of these reasons, the Court rejects Marion T's proffered interpretation of the TriEnda Lease and concludes that Marion T did not acquire title to the bus duct under the terms of the TriEnda Lease. Rather, any title that Marion T acquired to the bus duct came from TME under the Marion T Agreement, which was entered into subsequent to TME's entering into the Formall Agreement with Formall.

### 2. Formall Was Entitled to Remove All of the Bus Duct to the West Thermoformer

Under the Formall Agreement, Formall purchased, among other things: the west thermoformer, the "3000 AMP Power Panel," and the "[w]iring from switch gear to machine to include bus bar from switch gear to Power Panel." (DE 113 Stip. 8; Ex. 1; Tr. 441, 444-45). As the Court has already concluded, the only reasonable interpretation of that provision is as measured out from the facility's power source, because there is no bus duct between the power panel and the machine when measured out from the machine. Thus, it is clear that Formall was entitled to remove at least a portion of the bus duct to the west thermoformer extending from the building's main switch gear, which was located in the penthouse where the power entered the facility. The question that remains is: How much of the bus duct to the west thermoformer was Formall entitled to remove?

To review, as both Krohn and Gibbons described, the power came into the building from the utility substation on the outside of the building and traveled inside the building through the transformer to the main switch gear located in the penthouse. As Krohn testified, from the building's main switch gear, three lines of bus duct ran to three power panels that were located six to eight feet from the west thermoformer. (Tr. 340-41, 406; Ex. F-1). These

lines consisted of: (1) one line of 3000 amp bus duct that ran to a 3000 amp power panel; (2) one line of 1200 amp bus duct that ran to a 1200 amp power panel; and (3) two parallel lines of 800 amp bus duct that connected to a 1200 amp bus duct that ran to a 1200 amp power panel. (Tr. 341-43, 466; Ex. F-1). These three lines of bus duct were due to the thermoformer's extraordinary power requirements, the lines powered different aspects of the machine, and all three lines were required for the machine to operate in its full capacity twin-sheet mode. (Tr. 341, 343, 489-90).

Ultimately, Formall removed all of the 3000 amp bus duct, several short runs of the 1200 amp bus duct, the 3000 amp power panel, and the two 1200 amp power panels. (Tr. 412, 453-54, 473-77). Formall did not, however, remove 400 feet of 800 amp bus duct or 150 feet of 1200 amp bus duct. (Tr. 352, 386-87, 415-16, 473-77). Marion T—in particular, Jones—refused to allow Formall to remove that portion of the bus duct. (DE 113 Stip. 26; Tr. 416).

Krohn testified that Formall intended under the Formall Agreement to purchase "all of the electrical equipment necessary to power the [west] Brown thermoformer." (Tr. 347, 485). He stated that while this did not include the transformer or the main switch gear located in the penthouse, it did include "everything . . . below the switchgear," including all of the bus duct. (Tr. 348, 405, 418, 444-45, 451, 485; *see also* DE 5 at 5). He said that it would not have made sense for Formall to negotiate for and purchase only half of the thermoformer's electrical needs. (Tr. 455; *see also* DE 5 at 5-6).

There is support in the language of the Formall Agreement for Formall's position. As already explained, the Formall Agreement states that Formall purchased the "[w]iring from

43

switch gear to machine to include bus bar from switch gear to Power Panel." (DE 113 Stip. 8; Ex. 1). This language is consistent with Krohn's testimony that Formall's intent was to purchase all of the bus duct and associated power panels extending from the main switch gear in the penthouse to the west thermoformer. Indeed, the bus duct was specifically included in the language of the Formall Agreement, and it does not make sense that Krohn would purchase just one line or section of the bus duct, rather than all of the bus duct it took to power the west thermoformer.

Marion T argues, however, that if Formall is entitled to any bus duct under the Formall Agreement, it is only one line of bus duct, not all three lines. In support of this interpretation, Marion T points emphasizes that the Formall Agreement itemized the "3000 AMP Power Panel" but it does not mention the other two 1200 power panels. (*See* DE 113 Stip. 8; Ex. 1). But Krohn gave a reasonable explanation for this discrepancy. He explained that when he was originally negotiating the purchase, he did not know how many lines of power fed the west thermoformer, and thus, Formall did not have a count of exactly what electrical components were there. (Tr. 452-55; *see also* Ex. 5 at 5-6). He states that this uncertainty is why Formall "negotiated for the full electrical package." (Tr. 455). Krohn's explanation is supported, at least in part, by his and Kruschke's statements summarized in the 2012 police report. (Ex. 5).

Krohn further explains that the 3000 amp power panel was different than the two 1200 amp power panels. (Tr. 341-46, 466-70, 475). The 3000 amp power panel was a free standing unit some 10 feet away from the thermoformer (Ex. A at 107), while the two 1200 amp power panels were more integrated into the machine itself and housed in the control cabinets for the machine. (Tr. 341-46, 466-70, 475). This is a logical explanation for why TME itemized the

3000 amp power panel in the Formall Agreement, but not the two 1200 amp power panels.

Undoubtedly, the Formall Agreement is far from artful, as it consists of a one-page purchase

order with a second page of boilerplate terms and contains cursory descriptions and

misspellings.  (*See* Ex. 1); *see Conwell v. Gray Loon Outdoor Mktg. Grp., Inc.*, 906 N.E.2d

805, 813 (Ind. 2009) (stating that Indiana law does not require absolute certainty as to all terms

of a contract).

The Marion T Agreement, too, can be read consistently with Formall's proffered

interpretation of the Formall Agreement.  The Marion T Agreement allowed TME to remove

"[o]nly one buss ducting from the west Thermoformer to Transformer or switch gear.  Does

not include transformer or switch gear.  If affects any other alarms, heat, lights, or other factor

functions[,] client will repair or modify.  No buss duct to be removed on east Thermoformer."

(DE 113 Stip. 30).  While Marion T suggests that this provision means Formall was entitled to

removed just one 10-foot *piece* of bus duct, that makes no sense.  Nor does it seem logical that

Formall intended to purchase just one *line* of bus duct to the west thermoformer, which is

Marion T's alternate explanation, as Formall knew that the thermoformer required

extraordinary power and needed all three lines of bus duct to operate at full capacity.

Consequently, while in actuality there were three lines of bus duct running to the west

thermoformer, the most logical interpretation is that TME intended to remove all of the bus

duct to *one* thermoformer—that is, the west thermoformer that Formall had purchased—and

that Marion T was to retain all of the bus duct to the other thermoformer, that is, the east

thermoformer.  *See First Fed. Sav. Bank v. Key Mkts., Inc.*, 559 N.E.2d 600, 603 (Ind. Ct. App.

1990 (stating that the court "must accept an interpretation of the contract which harmonizes its

provisions as opposed to one which causes the provision to be conflicting" (citation omitted)).

As such, even if Kruschke of TME may later have attempted to convey some of the bus duct to

Marion T, whether mistakenly or otherwise, that is not determinative because by that time

TME no longer had title to the bus duct to the west thermoformer.  (*See* Ex. 5 at 6); Ind. Code

§ 26-1-2-403(a) (providing that under Indiana law, a purchaser of good acquires all title to

which the purchaser's transferor had power to transfer).

In sum, the Court finds that under the Formall Agreement, Formall obtained title to all

of the bus duct to the west thermoformer from TME.  Consequently, Formall was entitled to

remove the bus duct (and associated power panels and tap boxes) to the west thermoformer,

and thus, Formall did not "exercise unauthorized control over property of another" when

removing this equipment from the Marion T facility.  *MNW, LLC*, 884 F. Supp. 2d at 765,

Therefore, Marion T's tortious and criminal conversion claims based on Formall's removal of

a portion of the bus duct fail.

Conversely, when Marion T refused to allow Formall to remove all of the bus duct to

the west thermoformer (DE 113 Stip. 26), it "exercise[d] unauthorized control over the

property of [Marion T]," *MNW, LLC*, 884 F. Supp. 2d at 765, making Marion T liable to

Formall for tortious conversion of Formall's property.  There is no evidence, however, that

Marion T "knowingly or intentionally" exerted unauthorized control over the bus duct, Ind.

Code § 35-43-4-3(a), or that Marion T was "aware of a high probability its control over [the

bus duct] was unauthorized," *JET Credit Union*, 879 N.E.2d at 597.  Rather, the evidence at

trial indicates that Marion T had a basis to believe that it had acquired title to this equipment

under the Marion T Agreement.  Therefore, while Formall has proven its counterclaim of

tortious conversion based on Marion T's refusal to allow Formall to remove all of the bus duct to the west thermoformer, Formall has not proven its claim of criminal conversion against Marion T.

### G. Damages

"With respect to a conversion claim, damages are restricted to actual losses sustained as a proximate result of the conversion . . . ." *SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952 N.E.2d 758, 766 (Ind. Ct. App. 2011) (citation omitted). Because Marion T has established that Formall committed tortious conversion, but not criminal conversion, recovery of treble damages, costs, and attorney's fees are not available to Formall. *See* Ind. Code § 34-24-3-1. Accordingly, Formall is entitled to recover from Marion T the value of the portion of bus duct to the west thermoformer that Marion T refused to allow Formall to remove.[33]

Formall has submitted two quotes, $129,511.72 and $132,200.00, from electrical contractors for the value of the portion of the bus duct that Marion T refused to let it remove. (Exs. B, C; DE 124 at 10); *see SJS Refractory Co., LLC*, 952 N.E.2d at 767 ("[T]he purchase price of a good is . . . evidence of the value of that good." (citation omitted)). Marion T has not filed a response to Formall's proposed findings of fact and conclusions of law, and thus, Formall's evidence of damages is undisputed. Accordingly, the Court will award damages in the amount of $130,855.86, the average of the two quotes, in favor of Formall and against Marion T.

---

[33] Formall does not seek an award of prejudgment interest. (*See* DE 125 at 51; DE 126 at 27 (citing Ind. Code §§ 34-51-4-1 to -9; *Kosarko v. Padula*, 979 N.E.2d 144, 147-48 (Ind. 2012))).

## V.  CONCLUSION

The Court concludes that Formall has proven by a preponderance of the evidence its counterclaim of tortious conversion against Marion T.  Conversely, Formall has not proven its claim of criminal conversion against Marion T, and Marion T has not proven its claims of tortious conversion or criminal conversion against Formall.  The Clerk DIRECTS the Clerk to enter a judgment in the amount of $130,855.86 in favor of Formall and against Marion T, and to close this case.

SO ORDERED.

Enter for the 29th day of March 2018.

 /s/ Susan Collins                           
Susan Collins
United States Magistrate Judge